EDWIN A. LOMBARD, Judge.
LThe defendants, Michael Curtis and Demond Solomon, challenge the sufficiency of the evidehce underlying their respective convictions for manslaughter and raise other assignments of error pertaining to the validity and constitutionality of their convictions. In addition, defendant Curtis contends that his sentence is unconstitutionally excessive and illegal. After review of the record in light of the applicable law and arguments of the' parties, we affirm the defendants’ convictions and sentences.

Relevant Procedural History

The defendants were jointly charged by grand jury indictment on August 27, 2009, with second degree murder, a violation of La. Rev.Stat. 14:80.1, for the shooting death of Lindsey Singleton which occurred on March 29, 2009.[1] On September 2, 2009, they pleaded not guilty. After a hearing on March 12, 2010, the trial court denied defendants’ motions to suppress the evidence and identifications. The defendants’ trial before a twelve-person jury began on February 14, 2011, with jury selection. The trial court denied the defendants’ motion to declare La.Code Crim. Proc. art. 782(A) unconstitutional on February 15, 2011, and the following day both defendants were found guilty of 1 manslaughter. The trial court denied defendant Curtis’s motion for new trial and defendant Solomon’s motion for post-verdict judgment of acquittal on May 26, 2011, and, after waiver of sentencing delays, both defendants were sentenced to forty years at hard labor. On June 22, 2012, defendant Curtis was adjudicated a second-felony habitual offender, his original sentence was vacated and he was resen-tenced to eighty years at hard labor with credit for all time served.
The defendants’ appeal is timely filed.

Relevant Facts

The following evidence was adduced at trial.
On the evening of March 29, 2009, Officer Thomas Clark of the New Orleans Police Department (NOPD) Sixth District responded to a call pertaining to a shooting incident at 1223 South Johnson Street in the B.W. Cooper Housing Development. He arrived at the scene and observed a black male lying on the steps at that address, bleeding profusely. That individual, Lindsey Singleton, subsequently died.
Detective Nicholas Gernon of the NOPD arrived at the scene at approximately 7 p.m. to assist in the murder investigation. Although he canvassed the area and attempted to speak to potential witnesses, no one gave him their own names or that of any of the perpetrators.
NOPD Crime Lab Technician Shaheed Mohammed photographed the crime scene and collected evidence, including at least two CBC .40 S & W caliber cartridge casings, and wrote a report.
|3Panielle Singleton, the victim’s sister, testified that she was sitting in her parked car with the door open in the driveway of the South Johnson Street residence when her brother was shot. Just before the shooting, he had walked over to her to get a cigarette and returned to the porch where ten or fifteen people were gathered, including Calvin Rankins and them cousin Venezia Singleton. Ms. (Danielle) Single *327 ton was talking on her cell phone when she heard gunshots. After ducking down, she lifted her head and saw a white Grand Prix speed out of the driveway in front of her car. Looking back towards her brother, she saw him run towards her, grab his back, turn around, run to the other side of the driveway, and collapse on a porch. She did not see the license plate or the driver of the car but asserted that a photograph of a white Grand Prix depicted the same model of car, if not the specific car, that she saw drive away after the shooting. She admitted that she and her brother both knew defendant Curtis as a former resident of the housing project but was unable to say whether his (defendant Curtis) relationship with her brother was friendly or one of conflict.
Calvin Rankins testified that he was sitting on the porch with the victim, someone he knew only as “Nunu,” (subsequently identified as Venezia Singleton) and other persons when a white Pontiac stopped for a speedbump halfway through the driveway in front of them and “Demond” rolled down the window of the front passenger seat (which was closest to the porch) and pointed a gun. As “Demond” brought up the gun to fire, Mr. Rankins ran.
Mr. Rankins subsequently identified “Demond” in a photographic lineup as defendant Solomon. He also identified the driver of the vehicle in another photo lineup shown to him by the police, as well as an individual he referred to as “Bam” in a third photo lineup as the passenger in the backseat of the vehicle. Although |4Mr. Rankins identified the photo lineups relating to the two defendants, he was unable to definitely identify them in court. Specifically, when first asked whether he saw the shooter and the driver in court, Mr. Rankins replied in the affirmative but then identified defendant (Michael) Curtis as the driver referring to him as “Kevin” and when asked again whether he saw the shooter in court, Mr. Rankins replied in the negative. Mr. Rankins reiterated, however, that the individuals he picked out in the photo lineups were the individuals he saw on the day of the murder. He also asserted that the police did not promise him anything, coerce him in anyway, or force him to make an identification when they showed him the photo lineups. He stated that he did not know any of the people involved personally and that the only person he had seen prior to the day of the shooting was “Kevin,” and that was just around the project. Mr. Rankins declared he had never seen “Bam” or the individual he referred to as “Demond” before the shooting but that people in the project told him the names of “Bam” and “Demond.” On redirect examination, Mr. Rankins confirmed that the person he identified as “Demond,” number five in the photo lineup labeled State Exhibit 41, was the shooter. When asked if he was certain of his identification, he replied affirmatively. When asked again on recross examination whether, as he had previously stated, he did not see the shooter in the courtroom, Mr. Rankins replied: “I guess not. I don’t see him. Not right now I don’t. He could be somewhere else. I don’t know.”
In a recorded bench conference after Mr. Rankins was excused as a witness, the State moved to have the court permit the jury to be made aware of the fact that defendant Solomon had obscured his facial tattoos with makeup. Ultimately, the State read a stipulation to the jury, agreed to by defense counsel, to the effect that defendant Solomon had makeup applied to his forehead for trial that obscured his |fifacial tattoos. In addition, the defendant removed the makeup at the direction of the court and stood in front of the jury so that the jurors could observe his face without the makeup.
*328 Venezia Singleton, a cousin of the victim, testified that she was sitting to the left of the victim when shots rang out from the white Grand Prix automobile. Ms. Singleton stated that she saw the window of the vehicle being rolled down and then someone stick a gun out. The first shot fired hit the ground, but the shooter continued firing. As she ran behind a car on her left, she felt a bullet graze her. Her cousin ran in the other direction where there was no cover and, once shot, grabbed his side, staggered across the driveway and collapsed on a porch. Ms. (Venezia) Singleton remembered seeing Mr. Rankins on the evening of the shooting. She identified defendant Solomon in court as the shooter and defendant Curtis as the driver of the white Grand Prix. Ms. Singleton stated that, although she was there when the police arrived she did not speak to them at the scene. She explained that no one at that time was really talking to the police because the focus was on the victim.
On cross-examination, Ms. (Venezia) Singleton stated that the white Grand Prix slowed down but did not come to a complete stop. She again confirmed that she never talked to police about the shooting. She explained that, although the police had tried to contact her through family members, they did not have her real name as at the time of the shooting she went by the nickname “Nunu.” Moreover, she knew that the individuals responsible had been arrested and were incarcerated. Ms. Singleton stated that she did not decide to testify until the week before the trial. Upon being called by the District Attorney’s Office and informed that the defendants were going to trial, she agreed to come forward as a witness. Ms. Singleton stated that she learned defendant Solomon’s name after the incident from the people who, she surmised, he had been trying to shoot. Ms. [(¡Singleton stated that she had never been shown a photo lineup but that the shooting incident was unforgettable.
On further cross examination, Ms. Singleton stated that she saw two people in the vehicle and that the car windows were tinted, but not darkly. She testified that the windshield was not tinted and that she was able to see both defendants as the car approached the driveway, prior to the passenger side window being rolled down. Although she did not recognize the driver at the time of the shooting, she stated he was sitting in the courtroom. She did not remember what hairstyle the driver had that day — whether he had short hair or long dread locks-and could not see what type of clothing the driver was wearing but he had dark skin and a nose ring.
On redirect examination, Ms. Singleton confirmed that the trial was the first opportunity she had to see the defendants since the shooting. When asked whether there was any doubt in her mind that defendant Solomon was the shooter that day, Venezia replied: “Yeah, that’s who it was. It was him.” When asked whether there was any doubt in her mind that defendant Curtis was the person driving the car, Venezia replied: ‘Tes, he was driving.”
Dr. Paul McGarry, qualified by joint stipulation as an expert in the field of forensic pathology, performed the March 30, 2009, autopsy on the victim’s body, determining that the cause of death was a single gunshot wound to the center of Lindsey’s back, two inches to the left of the midline, ten inches below the shoulder. The bullet entered the victim’s left lung, causing massive hemorrhage in the left chest cavity, filling his respiratory tract with blood. The bullet then 17traveled upward into the victim’s neck, where the jacket of the bullet was found, and into his mouth, where the lead core of the bullet *329 was found. Dr. McGarry testified to the effect that the wound and the bullet tract were consistent with the shooter being forty-eight to fifty inches off the ground, shooting horizontally from the shoulder, and with the victim bending over in a moving posture, such as a running posture. Dr. McGarry viewed State Exhibit 11, a photo, and confirmed that in the case of someone firing through the window of a sedan, the shooter’s shoulder would be about four feet off the ground. Dr. McGarry identified a .40 caliber lead bullet and bullet jacket he recovered during the autopsy of the victim that, he confirmed, caused the victim’s death.
It was stipulated by the State and the defense that, if called to testify, Kenneth Leary would qualify as an expert in the field of firearms examination and that he would testify (consistent with his report) that four .40 caliber spent cartridge casings recovered from the scene were all fired from the same gun; that the bullet jacket recovered during the autopsy was consistent with .40 caliber ammunition; and that the lead bullet was unsuitable for caliber identification or comparison purposes.
Homicide Detective Robert Long of the NOPD, the lead detective in the murder investigation, testified that although initial attempts to speak with witnesses at the scene were unsuccessful, when he returned to his office he spoke to Danielle Singleton. He later developed defendants Curtis and Solomon as suspects, along with Dwayne Butler. Accordingly, he prepared photo lineups for those three suspects, which he identified as State Exhibits 40, 41, and 42, and presented them to Mr. Rankins. Mr. Rankins identified defendant Solomon as the person depicted in photo number five in one lineup, as well as the front seat passenger and shooter. | sWhen shown photo lineup labeled State Exhibit 41, Mr. Rankins identified defendant Curtis as the person depicted in photo number three, as well as the driver of the vehicle. Finally, Detective Long testified that in the third lineup Mr. Rankins identified Dwayne Butler, aka “Bam,” as the person in photo number two. Detective Long recalled that in his statement Mr. Rankins kept confusing defendant Curtis’s first name, referring to him both as “Michael” and “Kevin.” He identified State Exhibit 46 as a transcribed copy of a recorded statement by Calvin Rankins, which the defense objected to on hearsay grounds, and confirmed that it reflected Mr. Rankins’ confusion as to defendant Curtis’ first name.
Detective Long identified the arrest warrants issued for Curtis, Solomon, and Butler, and testified that, after Officer Dean Moore provided him with defendant Curtis’s cell phone number, he obtained a “real time” location of that cell phone — in the 9000 block of Oleander Street. When he arrived in that block, he saw a white Grand Prix parked in front of a residence at 9021 Oleander Street and, upon knocking on the door, defendant Curtis answered it. Defendant Curtis was taken into custody at that point and Detective Long ascertained that the owner of the Grand Prix was defendant Curtis’ girlfriend. Detective Long identified a photograph of that vehicle.
Detective Long confirmed also that, during the course of his investigation, he determined that the cell phone associated with defendant Curtis was used around the time of the murder. Accordingly, he plotted the location of the towers reflected in three calls placed near the time of the murder with a computer-generated printed map of the city. The first call was placed at 5:33 p.m. and received by the cell phone tower near First Street and Simon Bolivar Avenue. The second call, placed 5:48 p.m., was received by a cell phone tower located *330 in the |t>1200 block of- South Derbigny Street which is approximately two blocks from the scene of the murder. The third call was intercepted by a cell phone tower on Erato Street near South Broad Avenue at 5:55 p.m. The detective surmised that the murder occurred somewhere around 5:50 p.m., several minutes before the first 911 call was made. The detective indicated on the city map (State Exhibit .51) where the three cell towers were located and where the murder occurred.
Detective Long confirmed that a search warrant was obtained for the white Grand Prix but that nothing of evidentiary value was recovered from it. He also confirmed that a search warrant was obtained for the residence of defendant Solomon, but did not recall anything of evidentiary value being recovered from that residence. Detective Long identified both defendants in court. When asked if the defendants looked the way they had at the time he prepared photo lineups for them, the detective replied: “If I remember correctly, no, they do not.” On cross examination Detective Long confirmed that the photo in the lineup depicted defendant Curtis with a long dread-lock hairstyle which he no longer had at trial. Detective Long did not know when defendant Curtis cut his hair, but confirmed that his hair was short at the time of arrest. Detective Long stated that, to the best of his recollection, nó one provided' him with a physical description of the driver of the white Grand Prlx, identified by both Mr. Rankins and Venezia Singleton as defendant Curtis. Officer Moore had discovered the telephone number associated with defendant Curtis and had spoken to defendant Curtis on that number, but when Detective Long checked with the subscriber (Sprint), then-records of the number were not in the name of Michael Curtis. Detective Long conceded that he tracked the number to the 9000 block of Oleander Street a month after the murder |1fland there was no evidence Curtis used the cell phone associated with that number on the - day of the murder.
Detective Long also conceded that the phone calls associated with the phone on the day of the murder, particularly the one placed at 5:33 p.m., could have been made from three to five miles away from the tower in any direction, i.e., tracking the cell phone towers was not tracking the real time location of the cell phone with a GPS coordinate. Thus, as to the three cell phone calls made around the time of the murder, Detective Long could not say with certainty where the calls were made from, except to within three to five miles of the respective towers.
Detective Long confirmed that no witness identified the license plate number of the white Pontiac found parked outside the Oleander Street residence where defendant Curtis was arrested. He stated that the white Pontiac was photographed and he examined it but, because of the month-long time lapse between the murder and seizure of the vehicle, the vehicle was not processed for evidence and there was no objective evidence linking it to the homicide.
Detective Long acknowledged that despite the number of people in the vicinity at the time of the murder, the only witness he found in the two year period between the homicide and trial was Mr. Rankins. He also acknowledged that he received an anonymous tip that an individual named Kentrell Hickerson was the perpetrator of the crime and, although he compiled a photo lineup containing Hickerson’s photo, he did not show it to Mr. Rankins. Detective Long testified before taking the taped statement, Mr. Rankins indicated that he knew all three individuals, defendants Solomon and Curtis, as well as Dwayne But *331 ler but in the recorded statement denied knowing them.
| nDetective Long said on redirect examination that Crimestoppers had received a tip about Kentrell Hickerson. He further stated that defendants Solomon, Curtis and Dwayne Butler had also been named in Crimestoppers tips. Detective Long identified State Exhibit 46 as a transcript of a recorded statement he took from Calvin Rankins. The State introduced that statement, as well as State Exhibit 66, a CD recording of that statement, over a defense hearsay objection, and the CD was played for the jury.
Officer Moore confirmed that in March/ April 2009, defendant Curtis was a person of interest in the homicide investigation and that he assisted Detective Long in locating him. He obtained a contact telephone number from Curtis and gave it to Detective Long and helped Detective Long contact defendant Demond Solomon and Dwayne Butler. Officer Moore confirmed on further cross examination that he found Mr. Rankins and took him to Detective Long and that he did not pay Mr. Rankins for any information in the case.
Frank Mistretta, a private investigator since 1989, with approximately twenty years of law enforcement experience prior to that, testified that he was retained by defense counsel and found that defendant Curtis had been arrested on some traffic attachments on March 3, 2009. He obtained from the Orleans Parish Criminal Sheriff’s Office a booking information sheet containing a booking photo of Curtis that was taken on March 3, 2009. Mistret-ta identified Defense Exhibit 1 as that booking information sheet.

Errors Patent

A review of the record reveals no patent errors.

Sufficiency of the Evidence

112In their respective Assignments of Error No. 2, the defendants argue that the evidence is insufficient to support their respective convictions because the State failed to negate any reasonable probability of misidentification pursuant to Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).
Pursuant to Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in evaluating whether evidence is constitutionally sufficient to support a conviction, we must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. Green, supra. Notably, we are not called upon to decide whether we believe the witnesses or whether the conviction is contrary to the weight of the evidence. State v. Smith, 600 So.2d 1319, 1324 (La.1992). The testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction. State v. Wells, 2010-1338, p. 5 (La.App. 4 Cir. 3/30/11), 64 So.3d 303, 306. A factfinder’s decision concerning the credibility of a witness will not be disturbed unless it is clearly contrary to the evidence. State v. James, 2009-1188, p. 4 (La.App. 4 Cir. 2/24/10), 32 So.3d 993, 996. When the key issue is the defendant’s identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. State v. Weary, 2003-3067, p. 18 (La.4/24/06), 931 So.2d 297, 311.
*332 La.Rev.Stat. 14:31(A) defines manslaughter as:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by | ^provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed; or
(2) A homicide committed, without any intent to cause death or great bodily harm.
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person; or
(b) When the offender is resisting lawful arrest by means, or in a manner, not inherently dangerous, and the circumstances are such that the killing would not be murder under Article 30 or 30.1.
In turn, a principal is defined in La.Rev. Stat. 14:24:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
In this case, the State presented the testimony of two eyewitnesses that defendant Solomon fired the bullet that struck and ended the victim’s life and that defendant Curtis drove the car from within which defendant Solomon fired the fatal shot into the victim, thus making him a principal to the homicide. Although Mr. Rankins was unable to identify defendant Solomon in court and identified defendant Curtis as “Kevin,” shortly after the shooting, he positively identified both defendants in separate photo lineups, neither of which, as discussed infra, was suggestive. Moreover, at the close of Mr. Rankins’ testimony, it was determined that defendant Solomon was wearing facial makeup that obscured the indigo blue tattoo of a cross on his forehead between his eyebrows that was depicted in his photo in the photo lineup marked State Exhibit 40. Subsequently, defendant Solomon was ordered to remove his makeup to allow the jury to view him sans makeup. In addition, Detective Long testified that during his interview, Mr. 114Rankins was confused as to Curtis’ first name, referring to him interchangeably as “Kevin” and “Michael.” Mr. Rankins testified that “Nunu,” subsequently identified as Venezia Singleton, the victim’s cousin, was sitting on the porch with both him and the victim just prior to the shooting. Ms. (Venezia) Singleton, in turn, positively identified Solomon and Curtis, respectively, as the shooter and driver in court. Finally, although the victim’s sister could not positively identify the defendants as the perpetrators, she confirmed the peripheral details provided by Mr. Rankins and Ms. Venezia “Nunu” Singleton.
In arguing that the identifications of Mr. Rankins and Ms. (Venezia) Singleton are insufficient because the State failed to negate any reasonable probability of misiden-tification, the defendants misapprehend Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). That case pertains to identification made under suggestive circumstances that are arranged by the police and create the “substantial likelihood of misidentification.” *333 Accordingly, the factors of Manson v. Brathwaite come into play only after the defendant establishes improper police conduct, its very purpose being “to avoid depriving the jury of identification evidence that is reliable, notwithstanding improper police conduct.” Perry v. New Hampshire, — U.S. -, -, 132 S.Ct. 716, 724-726, 181 L.Ed.2d 694 (2012). In this case, however, there is no suggestion that the photo lineups presented to Mr. Ran-kins were suggestive or that his pre-trial identifications of defendants were made under suggestive circumstances arranged by police. Mr. Rankins’ in-court identification of the defendants was equivocal but he positively identified them as the perpetrators in the photo lineups presented by the police. Moreover, it was subsequently revealed that defendant Solomon was wearing facial makeup at trial that concealed, at least to some degree, his facial tattoo or tattoos, including a prominent indigo one of a hscross on his forehead, between his eyebrows and, in any event, Ms. (Venezia) Singleton positively identified them as the perpetrators in court. Accordingly, viewed in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the defendants were the perpetrators of the homicide. There is no merit in the defendants’ arguments that the evidence is insufficient to support their convictions.

Michael Curtis-Pro Se Assignment of Error 1

In his first pro se assignments of error, defendant Curtis asserts that the evidence is insufficient to support his conviction for manslaughter because the State failed to prove that he was a principal to the killing of the victim in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection as statutorily required.
With regard to his argument that there is insufficient evidence to support a conviction of manslaughter because there is no evidence that the offense was committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection, the general rule is that if the evidence adduced at trial is sufficient to support a conviction of the charged offense, then a responsive verdict is authorized. See State v. Knight, 2000-1051, p. 4 (La.App. 4 Cir. 5/23/01), 794 So.2d 33, 36-37. Accordingly, to obtain a conviction for second degree murder, the offense charged, the State had to prove only that the defendant killed a human being with the specific intent to kill or to inflict great bodily harm. La.Rev.Stat. 14:30.1. Clearly, viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that defendant Curtis was a principal to the second degree murder of Lindsey Singleton (having | if,aided and abetted defendant Solomon in killing the victim by driving the vehicle and slowing down or stopping it to allow defendant Solomon to take aim and fire the fatal shot) while possessing the specific intent to kill or inflict great bodily harm upon the victim. Thus, the statutorily-provided responsive verdict of manslaughter was authorized and was properly returned by the jury.
Defendant Curtis also argues that his trial counsel was ineffective in failing to object to the inclusion of the responsive verdict of guilty of manslaughter. Although as a general rule, a claim of ineffective assistance of counsel is more properly raised by application for post-conviction relief, it may be addressed if (as here) the record is sufficient to address it. State v. Rubens, 2010-1114, pp. 58-59 (La.App. 4 *334 Cir. 11/30/11), 83 So.3d 30, 66-67, writ denied, 2012-0374 (La.5/25/12), 90 So.3d 410. In order to prevail under the two-part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the defendant must show that (1) counsel’s performance was deficient and (2) he was prejudiced by the deficiency. State v. Jackson, 97-2220, p. 8 (La.App. 4 Cir. 5/12/99), 733 So.2d 736, 741. A counsel’s performance is ineffective when it is shown that he made.errors so serious that counsel was not functioning as the “counsel” guaranteed by the Sixth Amendment or if his errors were so serious as to deprive him of a fair trial. Strickland, 466 U.S. at 686, 104 S.Ct. 2052. Thus, the defendant must show that there is a reasonable probability that, but for counsel’s deficient performance, the result of the proceeding would have been different; “[a] reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 693, 104 S.Ct. 2052. However, if an alleged error falls “within the ambit of trial strategy” it does not “establish ineffective assistance of counsel.” State v. Bienemy, 483 So.2d 1105, 1107 (La.App. 4 Cir.1986).
As discussed, supra, the evidence against defendant Curtis was sufficient to support a conviction of second degree murder. Two witnesses identified him as the driver of a white Pontiac Grand Prix from which the fatal shot was fired into the victim and a white Pontiac Grand Prix automobile belonging to his girlfriend was found parked outside the residence where he was arrested a month after the killing. Thus, his defense counsel could have reasonably believed that the potential for conviction of second degree murder, carrying with it a mandatory sentence of life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence, warranted leaving in the legislatively-responsive verdict of manslaughter so as to provide a possible “compromise” alternative guilty verdict for jurors. Manslaughter carries a maximum sentence of forty-years at hard labor, with no restriction as to parole, probation, or suspension of sentence. While defendant Curtis ultimately received a sentence of eighty years at hard labor as a second-felony habitual offender and, pursuant to La.Rev.Stat. 15:529.1(G), such sentence is without the benefit of probation or suspension of sentence, he still has the benefit of parole. Accordingly, given that if an alleged error falls within the ambit of trial strategy it does not establish that counsel was ineffective, it cannot be said that defendant has shown that trial counsel was ineffective.
We find no merit in the defendant’s pro se assignments of error.

Motions to Suppress

In their respective first assignments of error, both defendants argue that the trial court erred in denying their motions to suppress Mr. Rankins’ respective out-of-court identifications of them in the photo identification procedures.
|1SA trial court’s determination of the admissibility of’identification evidence is entitled to great weight and will not be disturbed in' the absence of an abuse of discretion. State v. Stovall, 2007-0343, p. 17 (La.App. 4 Cir. 2/6/08), 977 So.2d 1074, 1085. In reviewing a trial court’s ruling on a motion to suppress, an appellate court is not limited to evidence adduced at the hearing on the motion to suppress; it may also consider any pertinent evidence given at trial of the case. State v. Brown, 2009-0884, p. 3 (La.App. 4 Cir. 3/31/10), 36 So.3d 974, 978. “A defendant attempting to suppress an identification must prove both that the identification itself was suggestive and that there was a likelihood of misidentification as a result of the identification procedure.” State v. *335 Sparks, 88-0017, p. 52 (La.5/11/11), 68 So.3d 435, 477 (emphasis in original). An identification procedure is suggestive if it unduly focuses attention on the defendant. Id. In addition to suggestiveness, a defendant must prove that there was a substantial likelihood of misidentification as a result of the identification procedure. State v. Robinson, 2009-0922, p. 3 (La.App. 4 Cir. 3/10/10), 50 So.3d 158, 161. Despite the existence of a suggestive pretrial identification, an identification may be permissible if there does not exist a very substantial likelihood of irreparable mis-identification. Manson v. Brathwaite, 432 U.S. at 116, 97 S.Ct. 2243. Under the Manson v. Brathwaite, the factors which courts must examine to determine, from the totality of the circumstances, whether the suggestive identification presents a substantial likelihood of misidentification include: (1) the witness’ opportunity to view the criminal at the time of the crime; (2) the witness’ degree of attention; (3) the accuracy of his prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. Id. at 114-15, 97 S.Ct. 2243. However, consideration of these factors |19is required only when there has been a police-arranged suggestive pre-trial identification, for it is only at that point it becomes necessary to determine whether, despite such suggestive identification, there nevertheless was not a very substantial likelihood of irreparable misidentification. Perry, supra.
It was jointly stipulated at the motion to suppress hearing that Detective Long presented three photo lineups to a witness on April 30, 2009, depicting, respectively, defendant Curtis, Dwayne Butler, and defendant Solomon. At this point, during the motion to suppress hearing, the name of the witness was not used but it is obvious that “the witness” referred to was Mr. Rankins. Detective Long testified that he presented the lineups individually, face down, and asked Mr. Rankins if he recognized anyone depicted in the photographs. As to the lineup containing a photo of defendant Solomon, Detective Long recalled that Mr. Rankins actually used the name “Demond” in making the identification. As to Dwayne Butler, Detective Long recalled Mr. Rankins using Butler’s nickname, “Bam,” in selecting Butler’s photo. He. further recalled Mr. Rankins using the name “Mike” when selecting defendant Curtis’ photo. Detective Long replied in the negative when asked at the motion to suppress hearing whether at any time he forced, coerced, or told Mr. Ran-kins who to select in any of the three lineups. He replied in the affirmative when asked whether Mr. Rankins made the identifications freely and voluntarily.
After having his memory refreshed by referring to a transcribed statement of Mr. Rankins, Detective Long testified on cross examination that he asked Mr. Rankins whether he had ever seen any of the three individuals before. The detective stated that Mr. Rankins replied in the negative. Detective Long also testified that, to the best of his recollection, Mr. Rankins initially indicated that he |2nknew of these individuals, that they were not complete strangers to him, and' that he had some limited knowledge as to each perpetrator. Detective Long had no first-hand knowledge how Mr. Rankins knew the names of the three individuals depicted in the lineups but recalled that Mr. Rankins described each perpetrator to him, although he could not recall what the description had been as to the individual in the driver’s seat. Detective Long recalled that he first spoke to Mr. Rankins on April 30, 2009, although he did not remember whether it was by phone or in person. Detective Long estimated that the witness *336 picked defendant Solomon out of the lineup within five seconds, stating “I’ll never forget that face,” and “I looked him right in the eyes.”
On appeal, the defendants assert that the respective photo-lineup identification procedures were “suggestive” because Detective Long testified at the hearing that in identifying defendant Curtis’ photo, he recalled Mr. Rankins used the name “Mike” and in identifying defendant Solomon’s photo he recalled Mr. Rankins using the name “Demon d.” They com plain that the trial court erred in failing to order the State to produce Mr. Rankins at the motion hearing to be examined as to how he knew them first names, but cite no authority for the proposition that the State must present an eyewitness who has made an identification that is the subject of the motion to suppress at the hearing. Moreover, the defendants had ample opportunity to cross examine Mr. Rankins at trial as to how he knew their first names at the time he made the identifications. Mr. Rankins testified on cross-examination that he did not know any of the people involved — the perpetrators — personally. He said the only one he had seen prior to the day of the shooting was “Kevin,” (ie., defendant Curtis) who he had seen around the project and, thus, came to know his name. Mr. Rankins stated he had |⅞1 never seen “Bam” or “Demond” before the shooting, but that people in the project had told him those names on the day of the shooting, after it had occurred. Rankins replied in the affirmative when asked on cross examination: “And so your identification -of these individuals in terms of the names of people, that came from something somebody else told you?”
On appeal, the defendants infer in their respective arguments that the identifications had to have been suggestive given that Rankins knew their first names at the time he made the identifications, had learned those names from others and, in defendant Solomon’s case, had learned his first name after the shooting. Thus, the defendants complain, the trial court erred in not employing the Manson v. Brathwaite factors to determine the reliability of the identifications.
Mr. Rankins made his respective identifications from two photo lineups consisting of six photos each, however, and there were no names on the lineups shown to Mr. Rankins. Thus, it is irrelevant whether he learned defendant Curtis’ first name from others in the project at some point prior to the shooting or learned defendant Solomon’s first name on the day of the shooting. Even if it could be inferred from the circumstances that some sort of collusion existed between Mr. Rankins and others to falsely accuse the defendants of the crime by knowingly identifying their photos as depicting the perpetrators, there is no hint of police misconduct. Detective Long testified that he presented each of the three photo lineups to Mr. Rankins separately, face down, and asked him if he recognized anyone in them and there is nothing in the record which suggests that the identification procedure unduly focused attention on the respective defendants’ photos. Accordingly, the Manson v. Brathwaite factors are not implicated. See Perry, supra (Manson v. Brathwaite factors applicable only to police misconduct | ^resulting in suggestive identification procedure). Therefore, the trial court did not abuse its discretion in denying the defendants’ motion to suppress and, accordingly, these assignments of error are without merit.

Michael Curtis-Assignment of Error No. 3

In his third assignment of error, defendant Curtis argues that the trial court erred in permitting Detective Long *337 to testify as to the location of three cell phone towers that received three respective cell phone calls made in close temporal proximity to the murder from a cell phone number linked to defendant Curtis. Notably, the cell phone records were not introduced into evidence and Detective Long did not consult them while testifying, referring to them only in the narrative of steps he took in the investigation. In any event, even accepting arguendo that the reference to the cell phone records and the proximity of the cell phone towers was inadmissible hearsay, any such error was harmless. State v. Campbell, 2006-0286, p. 69 (La.5/21/08), 988 So.2d 810, 855 (guilty verdict may stand if it is determined that it is unattributable to the error). In this case, Detective Long conceded on cross examination that even with reference to the cell towers, he could not determine where the cell phone was located in the three to five mile radius of the cell tower. Again on redirect examination by the State, Detective Long reiterated that his testimony as to the cell phone calls was limited to placing them within a radius of three to five miles of a particular cell phone tower. Thus, considering Detective Long’s admission of the limited relevance of the cell tower evidence, the eyewitness identification of defendant Curtis by Mr. Rankins and Ms. (Venezia) Singleton, as well as the evidence that defendant Curtis’ girlfriend owned a white Pontiac Grand Prix, the guilty verdict rendered in this case is clearly not attributable to any error pertaining to Detective Long’s testimony regarding the cell phone records. Finally, even assuming arguendo that Detective Long’s testimony about the | ¡^cell phone towers implicated Curtis’ right to confront witnesses against him and cross-examine his accusers, confrontation errors are also subject to harmless error analysis. There is no merit to this assignment of error.

Michael Curtis-Assignment of Error 4; Demond Solomon-Assignment of Error 3

Both defendants argue that conviction by a non-unanimous jury (ten to two votes of guilty of manslaughter) was a violation of the rights guaranteed by the Sixth and Fourteenth Amendments. However, it is well-settled that under current jurisprudence these assignments of error are without merit. State v. Bertrand, 08-2215, 08-2311 (La.3/17/09), 6 So.3d Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972); McDonald v. City of Chicago, — U.S. -, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010),(reaffirming Apodaca’s viability).

Michael Curtis-Supplemental Assignment of Error

In his supplemental assignment of error, defendant Curtis argues that his sentence of eighty years at hard labor as a second-felony habitual offender is unconstitutionally excessive.
A sentence is unconstitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime. State v. Ambeau, 2008-1191, p. 9 (La.App. 4 Cir. 2/11/09), 6 So.3d 215, 221. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. State v. Galindo, 2006-1090, pp. 15-16 (La.App. 4 Cir. 10/3/07), 968 So.2d 1102, 1113. In reviewing a claim that a sentence is excessive, an appellate court generally must determine whether the trial judge has adequately complied | ^with statutory guidelines in La. Code Crim. Proc. art. 894.1 and whether the sentence is warranted under the facts established by the record. State v. Wiltz, 2008-1441, p. 10 (La.App. 4 Cir. 12/16/09), 28 So.3d 554, 561. If adequate compliance *338 with La.Code Crim. Proc. art. 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of the case, keeping in mind that maximum sentences should be reserved for the most egregious offenders. State v. Bell, 2009-0588, p. 4 (La.App. 4 Cir. 10/14/09), 23 So.3d 981, 984. Even where there has not been full compliance with La.Code Crim. Proc. art. 894.1, resen-tencing is unnecessary where the record shows an adequate factual basis for the sentence imposed. State v. Stukes, 2008-1217, p. 25 (La.App. 4 Cir. 9/9/09), 19 So.3d 1233, 1250 (citation omitted); see also La. Code Crim. Proc. art. 881.4(D) (“appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed.”).
In sentencing defendant Curtis, the trial court set forth numerous reasons for imposing the maximum sentence, reviewing defendant Curtis’ extensive record as detailed in the presentencing report and noting, that although it contained no previous history of violent crime, it did indicate a total disregard for law enforcement and the rules of probation (specifically the rule prohibiting engaging in criminal activity while on probation) or for living in an orderly civilized society. The court also noted a history of substance abuse and that defendant tested positive for marijuana while on probation. The court also stressed the egregious circumstances of the killing of the victim in the instant crime, observing that the shooter fired while there were five or six people on the steps, a teenage girl was shot in the leg in the incident, and the victim died as result of a barrage of | ^gunfire. Thus, the court cited defendant Curtis’ creation of harm to more than one person as a factor under La. Code Crim. Proc. art. 894.1. Further, the court stated that it believed the imposition of any lesser sentence would deprecate the seriousness of the offense.
Although defendant’s record was lacking violent offenses, the instant offense itself was extremely violent. Moreover, although the defendant was only twenty-eight at the time of his sentencing, his arrest and conviction record was substantial. See State v. Green, 418 So.2d 609, 615 (La.1982) (eligibility for parole is an ame-lioratory factor which should be considered in gauging whether a sentence is excessive). Moreover, the evidence in this case was sufficient to support a conviction for second degree murder which would have carried a mandatory sentence of life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. Thus, considering all of the facts and circumstances, we cannot say the eighty-year sentence imposed on defendant makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, or is grossly out of proportion to the severity of the crime, nor does it shock our sense of justice.
There is no merit to this assignment of error.

Michael Curtis-Pro Se Assignment of Error 2

In his second pro se assignment of error, defendant Curtis argues that in vacating defendant’s original sentence and re-sentencing him as a second-felony habitual offender, the trial court failed to deduct from the new sentence the time actually served under the sentence vacated, as he asserts is required under La.Rev.Stat. 15:529.1(D)(3) of the Habitual Offender Law, which states:
12(i(3) When the judge finds that he has been convicted of a prior felony or felonies, or if he acknowledges or confesses in open court, after being duly cautioned as to his rights, that he has been so convicted, the court shall sentence him to the punishment prescribed *339 in this Section, and shall vacate the previous sentence if already imposed, deducting from the new sentence the time actually served under the sentence so vacated. The court shall provide written reasons for its determination. Either party may seek review of an adverse ruling, (emphasis added).
Our review of the record indicates that the trial court complied with La.Rev.Stat. 15:529.1(D)(3) by ordering that the habitual offender sentence be served with “credit for all time served.” The defendant offers no authority for the proposition that in “deducting from the new sentence the time actually served under the sentence so vacated,” a trial court must make an actual calculation of the number of days served under the sentence vacated and subtract them from the new habitual offender sentence. There is no merit to this assignment of error.

Conclusion

For the foregoing reasons, the convictions and sentences of defendants Michael Curtis and Demond Solomon are affirmed.
AFFIRMED

. A third individual, Dwayne Butler, was also charged in the same indictment. The State severed defendant Butler's trial, and he ultimately pleaded guilty to accessory after the fact to second degree murder.