JAMES F. McKAY, III, Chief Judge.
|, Finding that the trial court committed reversible error in denying the appellant’s statutory right to back strike jurors we reverse the appellant’s conviction, vacate his sentence and remand the matter to the trial court for a new trial. See La.C.Cr.P. art. 799.1
STATEMENT OF CASE
On December 2, 2011, the State charged Raymond Frith (“defendant”) with one count of possession of a firearm by a felon (count 1), a violation of La. R.S. 14:95.1, and one count of possession with intent to distribute cocaine (count 2), a violation of La. R.S. 40:967. The defendant pled not guilty to both charges at his arraignment on December 8, 2011.
On January 13, 2012, the trial court denied the defense motion to suppress the evidence and found probable cause to hold the defendant for trial. On September 10, 2012, the trial court denied the defendant’s motion to suppress the identification.
li>On August 1, 2012, the State filed a State v. Prieur[1] notice notifying the defense of its intent to introduce evidence of the defendant’s three prior convictions — a 2007 conviction for distribution of cocaine; a 2008 conviction for possession with intent to distribute cocaine; and a 2009 conviction for attempted possession of a firearm by a felon. On August 14, 2012, the trial court ruled that the State’s Prieur notice was sufficient. The defendant sought supervisory review of that ruling, and this Court denied the writ in part, affirming the trial court’s ruling admitting evidence of the defendant’s 2007 and 2008 drug *948 convictions but granted the writ as to the defendant’s 2009 conviction for attempted possession of a firearm by a felon, ruling that that conviction “[was] not relevant to the issue of whether [defendant] possessed a firearm in the instant matter.”
On November 2, 2012, the defendant filed a motion to sever offenses, which the trial court denied that day.
Trial in this matter began on November 4, 2012, and concluded on November 11, 2012, with the jury finding the defendant guilty as charged on both counts.
On November 29, 2012, the defendant filed motions for post-verdict judgment of acquittal and for new trial, both of which were denied on December 11, 2012.
On December 12, 2012, the trial court sentenced the defendant to fifteen years on count 1 and to twenty-five years on count 2. That same day, the State filed a multiple bill charging the defendant as a double offender as to count 1 and a triple offender as to count 2. The defendant pled guilty to the multiple-bill. The |,-¾trial judge vacated the defendant’s original sentences and resentenced him as a double offender as to count 1 to fifteen years at hard labor and to life at hard labor as a third offender as to count 2, with credit for time served. This timely appeal followed.
STATEMENT OF FACT
While patrolling in a marked vehicle, in the early morning hours of October 29, 2006, Detective Rob Barrere of the New Orleans Police Department (“NOPD”) Sixth District Investigative Unit observed a gray Maxima run a stop sign at the intersection of Second and Danneel Streets. Detective Barrere and his partner initiated a traffic stop, and as the car pulled over, Detective Barrere illuminated the interior of the vehicle for officer safety. When he ordered the Maxima’s three occupants to exit the vehicle, the back seat passenger quickly ducked down to the floorboard, clutched something with his hand and reached behind his back. Detective Barrere opened the door and observed the defendant stuffing a clear plastic bag, containing what Detective Barrere suspected was cocaine, down the back of his pants. Detective Barrere immediately restrained the defendant, removed him from the vehicle, handcuffed him and placed him under arrest. Thereafter, Detective Bar-rere searched the defendant and discovered in the back of the defendant’s pants a clear plastic bag containing twenty-one in-' dividually wrapped pieces of an off-white, rock-like substance, which Detective Bar-rere recognized from experience as crack cocaine. In addition, the detective retrieved $260.00 from the defendant’s left front pants pocket. Neither the driver of the Maxima, Lester Jones, nor the front seat passenger, Ronald Catchen, was arrested. Detective Barrere identified the bag of individually wrapped packages of cocaine he seized from the defendant that night.
|4On March 22, 2007, Detective Derrick Burke of the New Orleans Police Department (“NOPD”) Major Case Narcotics Unit was conducting a buy/bust operation, in a vehicle equipped with audio and video recording systems, targeting the known narcotics trafficking area in the 1300 block of South Saratoga Street. The NOPD photocopied currency to keep track of the serial numbers and provided the currency to Detective Burke to facilitate a purchase during the operation. As Detective Burke drove through the targeted area, he encountered a black female, who asked him what he wanted. He told her that he wanted a couple of “dimes”, street slang for $10.00 pieces of crack cocaine. She called to “Ray”, whom Detective Burke later learned was the defendant, Raymond Firth. The defendant placed the crack cocaine in her hand, which she handed to *949 Detective Burke in exchange for one of the photocopied $20.00 bills. The woman gave the money to the defendant, who then walked into the residence at 1327 South Saratoga Street. As the defendant exited the residence, Detective Burke radioed the take down team a description of the defendant’s clothing and location. The team moved in and placed the defendant under arrest. Immediately thereafter; Detective Burke drove by the location and positively identified the defendant. Detective Burke identified the compact disc containing the audio and video record of the transaction he had just described. The disc, which was played for the jury, bore case number C-24559 of 2007. Additionally, Detective Burke identified the plastic bag, bearing police item number C-2455907, containing the two pieces of crack cocaine he purchased from the defendant, pictures taken of the defendant wearing a black bandana and the test kit, which confirmed that the substance was crack cocaine. Detective Burke explained that based upon his experience, different drug dealers have different |/‘stash spots”, hidden locations where drug dealers keep their drugs, to prevent the police from finding the contraband on the drug dealer’s person.
NOPD Officer Joseph Pollard testified by stipulation as an expert in the field of the identification, analysis and comparison of latent fingerprints. Officer Pollard testified that he fingerprinted the defendant prior to trial and identified the card containing those fingerprints (State’s Exhibit 8).
Officer Pollard identified a certified fingerprint card (State’s Exhibit 9) in the defendant’s name relative to an October 29, 2006, arrest. He compared State’s Exhibit 9 to State’s Exhibit 8 and concluded that the fingerprints on those exhibits matched one another. He then identified a cert, pack under case No. 477-041, G, which included a bill of information containing fingerprints, a plea of guilty form, minute entry, screening and action form, fact sheet, gist of a police report and a docket master (State’s Exhibit 10). Officer Pollard compared the fingerprints on State’s Exhibit 8 to the fingerprints on the bill of information contained in Exhibit 10 and concluded that both sets of fingerprints were identical, and that they belonged to the defendant.
Next, Officer Pollard examined fingerprints (State’s Exhibit 11) relative to a March 22, 2007, arrest. Officer Pollard’s comparison of the fingerprints on State’s Exhibit 8 with the fingerprints relative to the March 2007 arrest concluded that the prints were identical on both exhibits.
Then, Officer Pollard identified the court record (State’s Exhibit 12) for case No. 470-102, Section “G”, which included a bill of information (State’s Exhibit 18) bearing the defendant’s name and fingerprints. The charge listed on the bill was unlawful distribution of cocaine. Officer Pollard noted that the exhibit also included a Boy-kin form bearing the defendant’s name. Officer Pollard compared |fithe fingerprints on the back of the bill of information to those on State’s Exhibit 8, and found that the fingerprints were identical, and that the prints belonged to the defendant.
Mr. Glenn Gilyot, civilian expert in the identification of controlled dangerous substances, tested the evidence in this case, under Item No. J 41343-11, which bore the defendant’s name, to determine whether the substance was in fact cocaine. He documented his testing results in his crime lab report. Gilyot tested two specimens from the first package which contained seventy-three small individually wrapped plastic packets. Those specimens tested positive for cocaine. He tested a second bag which contained two large slabs of a *950 rock-like substance. The slabs also proved to be cocaine.
In October 2011, Detective Leonard Standeford received information from an. anonymous concerned citizen regarding illegal narcotics activity at St. Andrew and South Liberty Streets. On October 27, 2011, at about 3:80 p.m., Detective Stande-ford set up surveillance from a position with an unobstructed view of a house in the 2300 block of St. Andrew Street. Through use of binoculars, Detective Standeford observed the defendant walk from South Liberty Street through an alley to the rear of the house at 2300-2304 St. Andrew Street and access a “stash spot”, a small hole under the house. The defendant appeared to be nervous — constantly looking over his shoulders, making sure no one was behind him. Detective Standeford identified a picture of the “stash spot” he was referring to. Detective Standeford watched the defendant retrieve a plastic bag, which contained several pieces of a rock-like substance, from the “stash spot” under the house. The defendant removed several pieces of the substance, placed them in his |7mouth[2] and walked' out of the alley to the street and out of Detective Standeford’s line of vision. Detective Standeford relayed his observation of the defendant’s behavior and description — black male wearing a black T-shirt, blue jeans with a short haircut and thin build — to the “take down” team consisting of Detectives Hinrichs, Ory and Black, who arrested the defendant. Thereafter, Detective Standeford maintained his surveillance of the house and directed Detective Hinrichs to the “stash spot,” from which Detective Hinrichs confiscated two plastic bags and a firearm.
Detective Standeford relocated to the Sixth District Station, where he positively identified the defendant. Lastly, Detective Standeford made an in-court identification of the defendant as the man he observed accessing the contraband from the rear of the house on St. Andrew Street. Moreover, he identified the firearm he watched Detective Hinrichs retrieve from the “stash spot”.
Detectives Kyle Hinrichs, Nicholas Ory and Troy Black testified, corroborating Detective Standeford’s testimony.
Detective Hinrichs identified the bags of cocaine he removed from the “stash spot” and the loaded .45 caliber weapon found with the bags of cocaine.
Detectives Ory and Black added that in addition to apprehending the defendant, they detained two men who were with the defendant — Joshua Bradford and Rodney Carr. Detective Ory noted that the three men were wearing different clothing so it was easy to spot the defendant. Detective Ory confirmed that officers confiscated $112.00 from the defendant’s front left pocket.
|^Officer Troy Pichón- testified that a field interview card is the memorialization of an encounter between an officer and an individual in the field. The card lists the person’s name, personal information, the date, time and location of the encounter and item number under which the card is filed. Officer Pichón encountered the defendant on October 14, 2011, and filled out a card indicating that meeting occurred at the intersection of Terpsichore and South Saratoga Streets. Two days later, on October 16, 2011, Officer Pichón encountered the defendant at the intersection of St. Andrew and South Liberty Streets. He *951 filled out another field interview card. Officer Pichón identified the defendant at trial as the person he encountered on October 14 and 16, 2011.
Mr. Donald Hancock, the telephone supervisor for the Orleans Parish Sheriffs Office, testified that his job is to monitor phone calls in the prison complex. All phone calls made by inmates are recorded and maintained. Mr. Hancock identified a CD recording of the phone calls made by the defendant. Portions of those phone calls were played during the trial.
ERRORS PATENT
A review for errors patent on the face of the record reveals none.
ASSIGNMENT OF ERROR NUMBER 1
In his first assignment, the defendant complains that the trial court erred by refusing to allow the defense to exercise its statutory right to “back strike” jurors. He argues that this error mandates reversal of his convictions and remand for a new trial.[3]
|9The defendant herein was charged with one count of possession of a firearm by a felon and one count of possession with the intent to distribute cocaine. He was convicted on both counts by 10-2 verdicts.
In this case, after the State and defense exercised their peremptory challenges to the first venire panel, defense counsel moved to back strike juror number 19, Charlene Vogelaar. The trial judge denied the request on the basis that he had announced at the outset of jury selection that back strikes would not be permitted.
After the second group of jurors had been similarly processed, defense counsel renewed his request as to juror number 19 and named two more jurors, numbers 12 and 17, Harriet Campbell-Young and Bennett Straight, respectively. Once again, the trial court denied the back strike requests over defense objection. Ultimately, Campbell-Young, Bennett and Vogelaar were seated on the jury.
The State does not oppose the defendant’s argument that the trial court erred by denying back strikes, citing La.C.Cr.P. art. 799.1; State v. Patterson, 2012-2042 (La.3/19/13), 112 So.3d 806; State v. Lewis, 2012-1021 (La.3/19/13), 112 So.3d 796, and noting that “[gjiven the non-unanimous verdict and the fact that all three jurors whom the defense moved to back strike voted to convict, it cannot be said that the judge’s error was harmless.”
“Back striking, or the exercise of a peremptory challenge to strike a provisionally-accepted juror, is expressly authorized by La.C.Cr.P. art. 799.1.” State v. Lewis, 2012-1021, p. 8 (La.3/19/13), 112 So.3d 796, 801. In 2006, the Legislature enacted La. C.Cr.P. art. 799.1, to codify the Louisiana Supreme Court’s prior jurisprudence. Lewis, 2012-1021 at p. 8, 112 So.3d at 801 (citing State v. Taylor, 93-2201, p. 22 (La.2/28/96), 669 So.2d 364, 376-377; and State v. Watts, 579 So.2d 931 (La.1991)). La.C.Cr.P. art. 799.1 “explicitly condones a juror selection strategy in which counsel may defer a final decision on accepting one or more jurors until counsel has viewed the entire panel of provisionally selected jurors, before they are sworn in by the court.” Lewis, 2012-1021 at pp. 8-9, 112 So.3d at 801.
By refusing to allow the defendant to back strike, the district court violated the plain language of La.C.Cr.P. art. 799.1, and thus erred. Nevertheless, the Louisiana Supreme Court in two companion *952 cases decided last year — Lewis and Patterson, supra — held that the error of failing to follow La.C.Cr.P. art. 799.1 is subject to a harmless error analysis — whether the guilty verdict actually rendered in the trial was surely unattributable to the error.
In Lewis at the conclusion of voir dire of a fourth venire panel, the trial judge denied the defendant the right to back strike unsworn Juror Wolfe, whom the defendant had provisionally accepted during voir dire of the first venire panel. The defendant was subsequently convicted. On appeal, this court found that, considering the plain language of La.C.Cr.P. art. 799.1, the district court had erred in denying the defendant the right to back strike the juror. Ultimately, this Court affirmed the defendant’s convictions and sentences, finding that the error was harmless, correctly citing the Louisiana Supreme Court’s prior decision in Taylor, supra for the proposition that the error was subject to the harmless error analysis. Granting the defendant’s writ application in Lewis, the Louisiana Supreme Court reversed. The Louisiana Supreme Court confirmed that the error was subject to the harmless error analysis set forth in Taylor, supra; however, it found that the State had failed to meet its burden of proving that the guilty verdicts rendered in the case were “surely unattributable” to the district court’s error in prohibiting the ^^defendant’s use of a peremptory challenge to back strike Juror Wolfe. The Louisiana Supreme Court distinguished the circumstances in Lewis from those in its prior decision in Taylor, stating:
First, apart from the practical and legal impossibility of following juror Wolfe into the jury deliberations to determine his effect, if any, on the resulting verdicts, the verdicts in this case were less than unanimous — 10-2 on count one and 11-1 on count two — suggesting that the evidence, and the jury’s belief that the state had proved defendant’s culpability beyond a reasonable doubt, were not overwhelming.
Second, this case is distinguishable from Taylor (wherein we concluded the district court error in not allowing back strikes was harmless) in two important respects. First, in Taylor, the defendant had a full opportunity to peremptorily challenge the objectionable juror. Not only was the defendant aware early in the voir dire that the district court would not permit back strikes, but the juror defendant identified as the individual he would have peremptorily challenged was in the last panel and nothing prevented the defendant from challenging that juror at the time. That situation differs significantly from the present one, in which the defendant was led to believe that he would be able to exercise a back strike against juror Wolfe by the district court’s apparent acquiescence to his statement, at the close- of the first venire panel, that “[w]e’d reserve.” Second, and most significantly, in Taylor, the defendant did not identify the juror he would have challenged until oral argument before this court. See Taylor, 93-2201 at 25, 669 So.2d at 877. Here, the objectionable juror was identified to the district court before jury selection was concluded, thereby eliminating any potential abuse of the jury selection process by the defendant. See Hailey, 02-1738 at 8 (La.App. 4 Cir. 9/17/03), 863 So.2d [564] at 569 (“[T]he effect of not requiring a defendant to specify at trial who he would have back-struck is to permit a defendant to gamble upon receiving a favorable jury verdict, and then, upon the return of an unfavorable verdict, scour the voir dire transcript for jurors whom he can claim he would have backstruck.”).
*953 In the final analysis, given the particular facts and circumstances of this case, we cannot conclude with certainty that the jury’s guilty verdicts were surely unattributable to the error of the district court in denying defendant the right to use a peremptory challenge to back strike juror Wolfe and, thus, that the error in prohibiting the back strike was harmless beyond a reasonable doubt. (Footnotes omitted).
Lewis, 2012-1021 at pp. 16-17, 112 So.3d at 805-806.
In the companion Patterson case, the Louisiana Supreme Court affirmed this court’s decision reversing a defendant’s conviction and sentence based on the district court’s violation of the defendant’s right to back strike a provisionally-|accept-ed12 juror. This Court in Patterson found that the district court’s error was not harmless. Agreeing with this Court, the Louisiana Supreme Court in Patterson reasoned:
As we point out in Lewis, the state’s burden in a case such as this is a difficult one, given jury dynamics and the possible influence even a single juror may have on the course of deliberations. Lewis, 2012-1021, p. 16, 112 So.3d at 805. As the court of appeal correctly noted, that burden is even more difficult when, as here, there is a split 10-2 jury verdict, and the replacement of one juror could have changed the outcome.
Certainly, under some circumstances, the error in denying back strikes may-be harmless. Such was the situation this court encountered in Taylor, where we found harmless error because the objectionable juror (who counsel did not identify until oral argument before this court) was a member of the fifth and final voir dire panel and counsel had the opportunity to challenge that juror before the swearing of the entire panel, but chose not to do so. Taylor, 1993-2201 at 25-26, 669 So.2d at 377-378. In this case, by contrast, counsel made it very clear that he wished to peremptorily challenge juror McCall and would have done so but for an error he made with the seating chart. Thus, unlike Taylor, there is no question that defense counsel would have struck Mr. McCall and the composition of the jury would have been different if not for the district court’s error in prohibiting back strikes.
The conviction in this case, as in Lewis, rests on witness credibility, as there is no physical evidence linking defendant to the crime. This fact, coupled with the less than unanimous jury verdict, makes it impossible to conclude, as the court of appeal correctly noted, that the verdict actually rendered in this case was surely unattributable to the error of the district court. The court of appeal correctly determined that the district court’s error in prohibiting back strikes was not harmless beyond a reasonable doubt and that defendant’s conviction and sentence must be vacated and the matter remand-' ed to the district court for a new trial.
Patterson, 2012-2042 at pp. 7-8, 112 So.3d at 811.
In Patterson, as in Lewis, the Louisiana Supreme Court rejected the notion that the defendant bore the burden on appeal of showing some specific prejudice that may have resulted from’the district court’s erroneous ruling barring the defendant’s use of the back strike. Rather, the Louisiana Supreme Court held that under the harmless error analysis, the State had the burden of showing that the jury’s verdict was surely unattributable tó the presence of the juror(s) on the panel who, but for the district court’s violation of La.C.Cr.P. art. 799.1, would have | iSbeen peremptorily challenged in favor of a different juror. *954 Patterson, 2012-2042 at p. 6, 112 So.3d at 811.
Applying the harmless error analysis adopted in Lewis and Patterson to this case and considering'that the jury verdicts were non-unanimous; that the defense immediately identified the three jurors it would have back struck; that those three jurors voted to convict the defendant; and given that in this case, as in Patterson and Lewis, the conviction rested upon witness credibility, i.e., that defendant had no narcotics or a weapon on his person at the time of his arrest, the State cannot carry its burden to prove that the jury’s verdict in this case was surely unattributable to the presence of those three jurors.
This assignment of error has merit.
ASSIGNMENT OF ERROR NUMBER 2
In a second assignment, the defendant charges error in the trial court’s admission of impermissible proof of prior bad acts.
Generally, a court may not admit evidence of other crimes to show a defendant is a man of bad character who has acted in conformity with his bad character. La.C.E. art. 404; State v. Brown, 2008-1616, p. 11 (La.App. 4 Cir. 3/31/04), 871 So.2d 1240, 1247, (citing State v. Taylor, 2001-1638, p. 10 (La.1/14/03), 838 So.2d 729, 741-42). The State may, however, introduce evidence of other crimes, wrongs or acts if it establishes an independent and relevant reason for admissibility, such as to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. La. C.E. art. 404(B)(1); State v. Rose, 2006-0402, p. 12 (La.2/22/07), 949 So.2d 1236, 1243.
A trial court’s ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion. The introduction of inadmissible | Mother crimes evidence results in a trial error subject to harmless error analysis on appeal. State v. Hollins, 2011-1435, p. 33 (La.App. 4 Cir. 8/29/13), 123 So.3d 840, 864 writ den. 2013-2555 (La.4/25/14), 138 So.3d 642.
The Louisiana Supreme Court adopted the federal test for harmless error announced in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), as a practical guide for determining whether substantial rights of the accused have been violated. See State v. Gibson, 391 So.2d 421 (La.1980). Chapman tests whether it appears “beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.” 386 U.S. at 24, 87 S.Ct. at 828. An error did not “contribute” to the verdict when the erroneous trial feature is unimportant in relation to everything else the jury considered on the issue.
Chapman was refined in Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). The Sullivan inquiry “is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.” Id., 508 U.S. at 279, 113 S.Ct. at 2081. The Louisiana Supreme Court adopted the Sullivan refinement of Chapman.
In this matter, during the State’s case-in-chief, Officer Troy Pichón testified that he conducted two field interviews of the defendant in the Sixth District in the month prior to his arrest in this case. He explained that a field interview card memorializes an encounter between an officer and anyone he comes in contact with. The card lists the person’s name, basic information, and the date, time and location of the encounter. The card is also assigned an item number. Officer Pichón identified the field interview cards he completed re- *955 fleeting his encounters |1Bwith the defendant on October 14 and 16, 2011, respectively. No other questions were asked about the field interview card.
Prior to Officer Pichón testifying, the defense objected on the basis that Officer Pichon’s testimony was “late disclosure discovery” and was inadmissible proof of prior bad acts under La. C.E. art. 404(B)(1) because the field interviews occurred only after the police stopped the defendant in the belief he was doing something wrong.
The trial judge cautioned the prosecutor that the witness should use the word “encountered” rather than “stopped” during his testimony. At the close of Officer Pi-chon’s testimony, the defense moved for mistrial.
In this case, the field interview cards were offered to “explain, repel, counteract or disprove” the defense claim made in opening statements that the defendant never went into the Sixth District. State v. Williams, 2003-0942 (La.App. 5 Cir. 1/27/04), 866 So.2d 1003, 1010. The State did not rely on the contents of the card as evidence of other crimes; as a matter of fact, neither the cards nor Officer Pichon’s testimony referenced any specific crime or bad act committed. Rather, the cards were referenced simply to document the defendant’s presence in the Sixth District only days before his arrest there for this offense. The field interview cards were offered in rebuttal to the defense opening statement. The trial court did not abuse its discretion in admitting the cards into evidence.
This assignment has no merit.
ASSIGNMENT OF ERROR NUMBER 3
In this assignment, the defendant argues that Louisiana Constitution Art. I, § 17 A and La.C.Cr.P. art. 782(A), that allow for non-unanimous jury verdicts, violate the Sixth Amendment and the Equal Protection Clause of the Fourteenth |,(Amendment because racial animus was the motivating factor in Louisiana’s introduction and first-time adoption of the non-unanimous jury provisions in 1898.
The defendant acknowledges that this Court has repeatedly held that it is bound by the United States Supreme Court’s decision in Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972). See, e.g. State v. Hankton, 2012-0375, p. 2 (La.App. 4 Cir. 8/2/13), 122 So.3d 1028, 1029, but urges this court to reconsider its adherence to those decisions and to preserve the issue for further appellate review in either the Louisiana Supreme court or the United States Supreme court.
In State v. Bertrand, 2008-2215 (La.3/17/09), 6 So.3d 738, the Louisiana Supreme Court effectively rejected the defendant’s argument that the use of non-unanimous jury verdicts has a disparate impact on minorities. The court noted that the defendant’s argument, that the use of non-unanimous jury verdicts had an insidious racial component, allowed minority viewpoints to be ignored, and was likely to chill participation by the precise groups whose exclusion the United States Constitution has proscribed, had also been argued in Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), and a majority of the Court had determined that such argument was without merit.
The United States Supreme Court in Apodaca held that the use of non-unanimous jury trials in state criminal cases does not violate a defendant’s right to trial by jury under the Sixth and Fourteenth Amendments. The Court in McDonald v. City of Chicago, 561 U.S. 742, 837, fn. 14, 130 S.Ct. 3020, 3035, fn. 14, 177 L.Ed.2d 894 (2010), recently affirmed the continuing viability of its holding in Apodaca that the use of non-unanimous juries in state *956 criminal trials is not prohibited by the Sixth and Fourteenth Amendments. In fact, the McDonald Court Instated: “The Court has held that although the Sixth Amendment right to trial by jury requires a unanimous jury verdict in federal criminal trials, it does not require a unanimous jury verdict in state criminal trials.” McDonald, 130 S.Ct. at 3035 n. 14 (emphasis supplied). Thus, the United States Supreme Court has effectively held that the use of non-unanimous juries does not have a discriminatory impact upon African-Americans and other minorities. This alone negates any argument that the use of non-unanimous jury verdicts violates the Equal Protection Clause.
The verdict in this case was 10-2 for conviction on both counts. Pre-trial, on November 7, 2012, the defense filed a motion requesting that the trial court hold Louisiana’s non-unanimous jury scheme unconstitutional under both the Sixth Amendment, as well as the equal protection clause of Fourteenth Amendment of the United States Constitution. In support of his argument against the constitutionality of non-unanimous juries, the defendant relies on Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972); Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) and the Official Journal of the Proceedings of the Constitutional Convention of the State of Louisiana, Article 116 (1898). The defendant herein notes that unlike the defendant in State v. Hankton, 2012-0375, p. 2 (La.App. 4 Cir. 8/2/13), 122 So.3d 1028, 1029, he requested a hearing on the issue, but the court summarily denied the motion. He claims that because of the trial court’s failure to develop the record on this issue for this Court’s review, this Court should remand the matter for a hearing.
While the record does indicate that the defendant requested a hearing on the motion to declare unconstitutional Louisiana’s non-unanimous jury verdict scheme, the record does not indicate that the defendant made an offer of testimony 11sor evidence to support the allegations of the motion. See State v. Magee, 2011-0574, p. 63 (La.9/28/12), 103 So.3d 285, 327-328, (quoting State v. Adams, 537 So.2d 1262, 1265 (La.App. 4 Cir.1989)) (“The purpose of an offer of proof is to create a record of the excluded evidence so that the reviewing court will know what the evidence was and will thus be able to determine if the exclusion was improper, and if so, whether the improper exclusion constituted reversible error.”)
Recently, State v. Webb, 2013-0146, p. 43, 44 (La.App. 4 Cir. 1/30/14), 133 So.3d 258, 285-286, this Court examined the arguments advanced, and authorities cited, by the defendant in this case in his motion to declare non-unanimous verdicts unconstitutional and rejected them. This Court noted:
Legislative acts are presumed to be constitutional. State v. Bazile, 2011-2201, p. 6 (La.1/24/12), 85 So.3d 1, 4. Considering the totality of the facts and circumstances, the defense failed to meet its burden of proving unconstitutional purposeful discrimination on the basis of race in the enactment of the non-unanimous jury verdict provision of Art. 116 of the Louisiana Constitution of 1898. The defendant cited no specific evidence in his trial court motion from which it can be concluded that non-unanimous verdicts actually resulted in a disparate impact on African-Americans in the years following the enactment of Art. 116 of the 1898 Constitution. It is recognized that, as a practical matter, such evidence likely would be difficult to compile. However, it remains defendant’s burden to prove a racially dispctr- *957 rate impact. The defendant cannot rely on mere argument and historical documents referring to intentional disenfranchisement without expert testimony to tie the racial animus behind voting restrictions to a similar racial animus behind Article 116, specifically. State v. Hankton, 2012-0375 (La.App. 4 Cir. 8/2/13), 122 So.3d 1028.
While the defendant in this case may have established racial motivation behind the 1898 constitutional provisions on voting, he has not established that every difference between the 1898 Constitution and the 1879 Constitution is the product of racial animus, (emphasis supplied).
Without sufficient evidence in the record to support a ruling of unconstitutionality, the district court committed no error in denying the defendant’s constitutional challenge. The defendant has failed to meet his burden of proving either that La. Const, art. I § 17(A) or La.C.Cr.P. art. 782(A) is unconstitutional | ,9under the Equal Protection Clause of the Fourteenth Amendment, insofar as providing non-unanimous jury verdicts, or that his convictions by non-unanimous jury verdicts were similarly unconstitutional. This assignment has no merit.
ASSIGNMENT OF ERROR NUMBER 4
In a final assignment of error, the defendant claims that his conviction under La. R.S. 14:95.1[4], which prohibits convicted felons from possessing a firearm, is unconstitutional, in violation of La. Const. Art. I § 11[5].
*958 Recently, in State v. Eberhardt, 2013-2306 (La.7/1/14), 145 So.3d 377, the Louisiana Supreme held that under strict scrutiny review, La. R.S. 14:95.1 does not violate the right to bear arms under La. Const. Art. I § 11, concluding that:
... LSA-R.S. 14:95.1 serves a compelling governmental interest that has long been jurisprudentially recognized and is grounded in the legislature’s intent to protect the safety of the general public from felons convicted of Unspecified serious crimes, who have demonstrated a dangerous disregard for the law and the safety of others and who present a potential threat of further or future criminal activity. See State v. Amos, 343 So.2d at 168. Further, the law is narrowly tailored in its application to the possession of firearms or the carrying of concealed weapons for a period of only ten years from the date of completion of sentence, probation, parole, or suspension of sentence, and to only those convicted of the enumerated felonies determined by the legislature to be offenses having the actual or potential danger of harm to other members of the general public. Under these circumstances, we find “a long history, a substantial consensus, and simple common sense” to be sufficient evidence for even a strict scrutiny review. State in the Interest of J.M., [144] So.3d [853,] at [861 (La. 2014) ] (quoting Burson v. Freeman, 504 U.S. 191, 211, 112 S.Ct. 1846, 1858, 119 L.Ed.2d 5 (1992)).
Furthermore, to challenge a legislative act as unconstitutional on its face is the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the statute would be valid. Prejean v. Barousse, 2012-1177 (La.1/29/13), 107 So.3d 569, 571-72; City of New Orleans v. Louisiana Assessors’ Retirement and Relief Fund, 2005-2548 (La.10/1/07), 986 So.2d 1, 19; State v. Brown, 94-1290 (La.1/17/95), 648 So.2d 872, 875 (citing United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987)). Generally, the legislature may do anything that the constitution does not prohibit. The task is to determine whether the challenged statute is so inconsistent with our constitution that there exists no set of circumstances under which the statute would be valid. See Prejean v. Barousse, 107 So.3d at 572. See also Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 449, 128 S.Ct. 1184, 1190, 170 L.Ed.2d 151 (2008) (“[A] plaintiff can only succeed in a facial challenge by ‘establish[ing] that no set of circumstances exists under which the Act would be valid,’ i.e., that the law is unconstitutional in all of its applications.”). No such showing can be* made in the instant case; as seen in State v. Draughter, circumstances clearly exist where LSA-R.S. 14:95.1 is valid. Therefore, we find no merit in the defendants’ facial challenge to LSA-R.S. 14:95.1.
We also reject the defendants’ argument that LSA-R.S. 14:95.1 is unconstitutional as applied to their individual circumstances.
Each of the three defendants reof-fended within a relatively short period of time following the completion of previously imposed State supervision. Stevens was released from State supervision on his prior conviction for possession of marijuana on May 18, 2011, and he was charged with committing a violation of LSA-R.S. 14:95.1 on June 8, 2011, only three weeks later. Eber- *959 hardt was released from State supervision on his prior conviction of unauthorized entry of an inhabited dwelling on May BO, 2010, and he was charged with committing a violation of LSA-R.S. 14:95.1 on June 27, 2012, approximately two years later (though we note that the third count of the indictment against Eberhardt charged him with cyberstalking, which had allegedly commenced on or about November 7, 2010, only twenty-three weeks after completion of his prior State supervision). Taylor completed his prior federal sentence for possession of cocaine and was released from federal supervision on June 1, 2007, and he l^was charged with committing a violation of LSA-R.S. 14:95.1 on June 21, 2011, approximately four years later.
These three defendants illustrate, rather than show exceptions to, the principles underlying felon-in-possession laws such as LSA-R. S. 14:95.1, i.e., that certain convicted felons have demonstrated a dangerous disregard for the law and present a potential threat of further or future criminal activity and are more likely than nonfelons to engage in illegal and violent gun use. These cases demonstrate that convicted felons are not only at risk to reoffend, but are at risk to reoffend using firearms.
Id., 2013-2306, p. 7-8, 145 So.3d at 383-82.
This assignment of error has no merit.
CONCLUSION
For the above and forgoing we reverse the defendant’s convictions and vacated his sentences specifically in accord with the reasoning in Assignment of Error Number 1 and remand the matter for a new trial.
REVERSED; VACATED AND REMANDED.
JENKINS, J., concurs and assigns reasons.

. 277 So.2d 126 (La.1973).

. Detective Standeford explained that this was a common practice among drug dealers. This practice allows the suspect to either spit the contraband out or swallow it if the police show up.

. We note that the State concedes in its brief and during oral argument before this Court, that the trial court's refusal to allow back strikes was in fact reversible error. However, we will address this issue in our immediate opinion.

. La. R.S. 14:95.1 provides:
Possession of firearm or carrying concealed weapon by a person convicted of certain felonies
A. It is unlawful for any person who has been convicted of a crime of violence as defined in R.S. 14:2(B) which is a felony or simple burglary, burglary of a pharmacy, burglary of an inhabited dwelling, unauthorized entry of an inhabited dwelling, felony illegal use of weapons or dangerous instru-mentalities, manufacture or possession of a delayed action incendiary device, manufacture or possession of a bomb, or possession of a firearm while in the possession of or during the sale or distribution of a controlled dangerous substance, or any violation of the Uniform Controlled Dangerous Substances Law which is a felony, or any crime which is defined as a sex offense in R.S. 15:541, or any crime defined as an attempt to commit one of the above-enumerated offenses under the laws of this state, or who has been convicted under the laws of any other state or of the United States or of any foreign government or country of a crime which, if committed in this state, would be one of the above-enumerated crimes, to possess a firearm or carry a concealed weapon.
B. Whoever is found guilty of violating the provisions of this Section shall be imprisoned at hard labor for not less than ten nor more than twenty years without the benefit of probation, parole, or suspension of sentence and be fined not less than one thousand dollars nor more than five thousand dollars. Notwithstanding the provisions of R.S. 14:27, whoever is found guilty of attempting to violate the provisions of this Section shall be imprisoned at hard labor for not more than seven and one-half years and fined not less than five hundred dollars nor more than two thousand five hundred dollars.
C. The provisions of this Section prohibiting the possession of firearms and carrying concealed weapons by persons who have been convicted of certain felonies shall not apply to any person who has not been-convicted of any felony for a period of ten years from the date of completion of sentence, probation, parole, or suspension of sentence.
D. For the purposes of this Section, “firearm” means any pistol, revolver, rifle, shotgun, machine gun, submachine gun, black powder weapon, or assault rifle which is designed to fire or is capable of firing fixed cartridge ammunition or from which a shot or projectile is discharged by an explosive.

. La. Const. 1, § 11, as amended in 2012, provides:
The right of each citizen to keep and bear arms is fundamental and shall not be in *958 fringed. Any restriction on this right shall be subject to strict scrutiny.