Judge Dennis R. Bagneris, Pro Tempore
Defendant, Janero L. McBride, appeals his convictions and sentences on three counts of criminal activity. For reasons that follow, we affirm the convictions and sentences.
PROCEDURAL HISTORY
On August 27, 2015, a grand jury returned an indictment charging both Janero McBride and Jacob Love with the second degree murder of Toby Roche, in violation of R.S. 14:30.1 ; two counts of attempted second degree murder of Dejon Miguel and Malik Miguel, in violation of R.S. 14:27 ; and one count of obstruction of justice (in connection with the murder of Toby Roche) when the punishment is death or life imprisonment at hard labor, in violation of R.S. 14:130.1(B)(1).
On February 16, 2017, Jacob Love entered into a plea agreement with the State on all charges. As for Janero McBride, the obstruction of justice charge was severed and ultimately dismissed, while the remaining charges were tried to a jury that returned a guilty verdict on all charges. McBride was sentenced to life imprisonment on count one and thirty years each on counts two and three, all sentences to run concurrently at hard labor without the benefit of probation, parole, or suspension of sentence. Defendant timely appeals his convictions and sentences to this Court.
STATEMENT OF FACTS
During the course of defendant's two-day trial, the jury heard testimony from several New Orleans Police Department officers and detectives who investigated the shooting incident or who were otherwise involved with the incident; they heard testimony from the sister of the deceased shooting victim; testimony from a forensic pathologist; and testimony from Jacob Love.
Sergeant Walter Powers, Commander of the Communications Unit of the New Orleans Police Department (NOPD), testified that NOPD received a 9-1-1 call reporting a homicide on May 13, 2015 at 2:29 p.m. from Melba's Café on Elysian Fields Avenue. The caller described the shooter as a black male wearing a black T-shirt and black face mask and driving a burgundy car. The dispatch report further indicated that a possible suspect was hiding under a house on Spain Street. Another call received at 2:55 p.m. reported that a victim named Dejon Miguel had been admitted to University Hospital. Neither a name nor a physical description of the perpetrator was provided in either call.
*385 NOPD Detective Johnny Magee testified that he was driving to the police station down North Robertson when he heard gunshots coming from Melba's on the opposite side of the street. When he looked in the direction of the gunshots, he observed a male with a black towel or shirt covering his face who was shooting at another car. Detective Magee pulled into a parking lot and called for assistance on his radio. He observed one of the vehicles exit Melba's parking lot and drive down Marais Street. Detective Magee pursued a white Hyundai, but he was unable to maintain its location. When asked about surveillance video that recorded the incident, Detective Magee indicated that the video showed a man exit a white vehicle and shoot at a red vehicle. As the shooter walked back to his car, the video showed Magee's police unit passing the scene. Detective Magee admitted that he could not identify the initial shooter, that he was unaware of the number of occupants in the vehicle, and that he did not know the vehicle's license plate number, although he believed the car had a Florida plate.
NOPD Homicide Detective Ryan Vaught testified that the incident involved several crime scenes, and he assisted in processing the scene at Melba's. Detective Vaught observed that many vehicles in the parking lot sustained damage during the shooting, and the ground was littered with spent cartridge casings that were collected as evidence. At least one casing was fired from a forty-caliber Smith and Wesson. Detective Vaught explained that he was able to obtain the surveillance footage from Melba's that recorded the incident. He did not conduct any witness interviews at the scene, however.
NOPD Homicide Detective Tindell Murdock, Jr., testified that he was initially assigned to process the crime scene at Melba's with Detective Vaught by helping to locate all of the physical evidence at the scene. Subsequently he was reassigned to the scene in the 2300 block of Marais Street, where possible suspects may have discarded evidence from a vehicle as they fled. At the Marais Street crime scene, Det. Murdock collected two forty-caliber Glock semi-automatic weapons, shattered magazine pieces, and several live rounds that appeared to have been ejected from the broken magazines.
NOPD Homicide Detective Rayell Johnson was the lead detective on the case. He testified that, in addition to the crime scenes at Melba's and at Marais Street, there was a third crime scene at the corner of Crozat and Iberville Streets where the deceased body of Toby Roche was discovered in the passenger seat of a red Honda Accord. Detective Johnson observed multiple bullet holes all over the vehicle. Detective Johnson also testified that Dejon Miguel, another shooting victim, had been relocated to a nearby hospital where he was treated for gunshot wounds to his back and both of his hands.
At the time that the red vehicle was discovered, the doors were open, spent cartridge casings had collected on the front windshield, both the windshield and passenger side door were riddled with bullet holes, and the rear windshield had been shot out. There was blood on the steering wheel and throughout the interior, and a loaded handgun was found on the floorboard behind the passenger seat.
Detective Johnson testified that ballistic testing revealed that the bullet casings recovered from Melba's parking lot were fired from the guns found at the Marais Street scene, and the casings recovered from the deceased's vehicle were fired from the gun found on the floorboard of the same vehicle. NOPD Crime Lab ballistics expert, Sean McElrath, testified that twenty casings at Melba's were fired from *386 one of the forty-caliber Glock semiautomatic handguns recovered from the Marais crime scene and eight were fired from the other. Additionally, eight casings recovered from the search of the victims' car at NOPD headquarters were fired from a nine millimeter Smith and Wesson found in the victims' vehicle.
Once Detective Johnson finished processing the crime scene at Crozat and Iberville Streets, he went to the homicide office to interview a suspect, Jacob Love. Following the interview, he obtained an arrest warrant for both Love and defendant. Detective Johnson testified that approximately one month later, federal marshals located and arrested defendant in Austin, Texas and returned him to New Orleans. Detective Johnson took DNA samples from Jacob Love and from defendant, but neither the suspects' nor the victims' "identities" were discovered on any of the weapons recovered.
Detective Johnson interviewed Dejon Miguel at the hospital, but "he said he didn't see anything, didn't know anything, [and] wasn't cooperative." Upon viewing the surveillance video footage that Detective Vaught had recovered from Melba's, Detective Johnson agreed that the footage showed three individuals, identified as the victims, entering their vehicle in Melba's parking lot when a white car, belonging to the perpetrators, pulled into the lot. The footage showed the passenger in the white car firing a gun multiple times. It appeared to Detective Johnson that the driver of the white car fired at the victims' vehicle first, the victims returned fire, and then the passenger door of the white car opened and the passenger shot at the rear of the victims' vehicle.
Detective Johnson also pointed out that Officer Magee's police vehicle appears at the top of the surveillance video frame just as the shooting began. According to Detective Johnson's narration of the surveillance footage, the police unit then pulled into a lot and turned around in time to chase the perpetrators as they fled in their vehicle. The footage also shows the victims' vehicle fleeing the scene.
On cross-examination, Detective Johnson admitted that all of the information contained in the warrant for defendant's arrest was supplied by Jacob Love. He stated that none of the bullet casings or the weapons discovered at any of the crime scenes contained defendant's DNA or fingerprints. Although the crime lab was able to recover DNA from the guns involved, the DNA recovered from the Victims' gun belonged to Troy Scott, who he did not believe was in the victims' vehicle during the shooting. The DNA recovered from the perpetrator's gun belonged to Cornell Gilbert, but Jacob Love had not implicated Cornell Gilbert in his statement. Detective Johnson was not able to locate Troy Scott or Cornell Gilbert during his investigation of this matter.
Jacob Love, the former codefendant in the instant case, testified that in May of 2015 he was living in the Marigny district near Spain and Urquhart Streets and had been working as a waiter at Mandina's for nearly two years. Love stated that he had known defendant since they were kids; they grew up together in the Seventh Ward. On May 13, 2015, Love asked defendant to drive him to his workplace. After defendant picked up Love from his residence, they drove to Melba's to conduct a narcotics transaction. While they were waiting to make the transaction, Love observed three individuals whom he recognized as residents of the Fourth Ward, including Dejon Miguel, walking across the street. Love testified that there had been a continuing feud between the Fourth and Seventh Ward residents, and he and the defendant and several others had engaged *387 in a verbal altercation with these individuals at a concert three days before the shooting. Love stated that when the three individuals entered their car, defendant removed his shirt and used it to cover his face, exited the vehicle, and began shooting at the victims. The victims returned fire, so Love stuck his arm out of the passenger door and also began shooting at the victims.
After the shooting, defendant and Love fled in their vehicle down Marais Street. As they fled, Love threw both his gun and defendant's gun out of the vehicle's window on Marais between Mandeville and Spain Streets. At some point Love also jumped from the moving vehicle and proceeded on foot toward his house. The police apprehended Love twenty minutes later in his next-door neighbor's yard and transported him to police headquarters.
During his interrogation, Love initially indicated that there were three people in defendant's car, but he later corrected himself, stating that only he and defendant were in the vehicle. At all times, however, Love maintained that defendant instigated the shooting. Love also selected defendant's picture from a "six-pack lineup" that he viewed during the interrogation.[1] Love also identified defendant as the perpetrator during his trial testimony. Furthermore, Love admitted that he had entered into an agreement with the State-in exchange for guilty pleas in the instant case, he would receive a twenty-year prison sentence.
On cross-examination, Love admitted that he had been on probation for possession of heroin with the intent to distribute and had another previous conviction for distribution of cocaine. Love testified that he had been carrying a gun for protection on the day of the shooting because he had been shot in the past. He admitted to initially telling the detectives that the gun was not his. He also admitted that he initially denied any involvement in the shooting and denied throwing the guns out of the vehicle. Love also denied writing a letter that named the real perpetrator as Clarence Johnson, though Love indicated that he was aware of such a letter.
On redirect, Love testified that he initially lied to the detectives because he was confused and scared, but he finally admitted the truth because it weighed on his conscience and he felt it was the right thing to do. Love stated that Dejon Miguel was the intended target; Love did not know the deceased victim, Toby Roche.
As for the letter naming Clarence Johnson as the perpetrator, Love testified that he had seen defendant write the letter when they were housed together awaiting trial. Love testified that he did not write or sign the letter, he did not instruct defendant to write it, and nothing contained in the letter was true.
Orleans Parish Chief Forensic Pathologist, Samantha Huber, performed the autopsy on the deceased, Toby Roche, on May 14, 2015. She testified that Roche sustained three gunshot wounds : one in his back, which perforated his left lung and fractured two ribs before exiting his body; one in his lower back, which hit his liver, right kidney, pancreas, and stomach before exiting his body; and one straight through his right thigh, which punctured only muscle and skin. Dr. Huber stated that the gunshot to his thigh would have been "survivable,"
*388 but the two gunshots to his back, which perforated several major organs, were fatal. She listed the deceased's cause of death as a homicide.
After deliberating, the jury returned a verdict of guilty on all three counts. Defendant waived sentencing delays, and he was sentenced to life without parole, probation, or suspension of sentence on the second degree murder charge, and 30 years for each count of attempted second degree murder, the sentences to be served concurrently.
Defendant appeals his convictions and sentences.
DISCUSSION
ASSIGNMENT OF ERROR NUMBER 1
Defendant's first assignment of error asserts that the evidence was insufficient to sustain the conviction, because Love's testimony, as the sole evidence that the State presented to implicate defendant in this case as an accomplice to the crimes, cannot sustain the guilty verdict.
The Supreme Court provided the standard for review of a claim of insufficiency of the evidence in Jackson v. Virginia , 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) :
[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Johnson v. Louisiana , 406 U.S., [356] at 362, 92 S.Ct. [1620] at 1624-1625 [32 L.Ed.2d 152 (1972) ]. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw
reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution.
(Emphasis in original).
"Under the Jackson standard, the rational credibility determinations of the trier of fact are not to be second guessed by a reviewing court." State v. Jones , 11-0649, p. 3 (La. App. 4 Cir. 10/19/11), 76 So.3d 608, 611 (citing State v. Juluke , 98-341 (La. 1/8/99), 725 So.2d 1291, 1293 ). "The testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction." State v. Wells , 10-1338, p. 5 (La. App. 4 Cir. 3/30/11), 64 So.3d 303, 306.
Under La. R.S. 14:30.1, second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. "Specific intent" is the state of mind that exists when circumstances indicate that the offender actively desires the prescribed criminal consequences to follow his act. La. R.S. 14:10(1). "Specific intent need not be proven as fact but may be inferred from the circumstances and the actions of the accused." State v. Hickman , 15-0817, p. 11 (La. App. 4 Cir. 5/16/16), 194 So.3d 1160, 1167. The use of a deadly weapon in lethal circumstances will support a finding of specific intent. State v. Brown , 03-0897, p. 22 (La. 4/12/05), 907 So.2d 1, 18.
In this case, the State presented surveillance video footage of the incident. According to the record, the surveillance video depicted three men crossing the street and entering a red vehicle parked at Melba's. A white vehicle then pulled into the parking lot and the driver exited, wearing something around his face to conceal his identity, and began shooting into the red vehicle that the three men *389 occupied. Shortly thereafter, police located the red vehicle, which was riddled with bullet holes and had been abandoned. The deceased was discovered inside the vehicle with three gunshot wounds, two of which caused his death. Of the two surviving victims, one sustained several non-fatal gunshot wounds ; the status of the other is unknown, other than that he had been subjected to a barrage of gunfire while inside the red vehicle at Melba's.
Furthermore, Jacob Love testified at trial that he was present at the scene and witnessed the events unfold. He testified that he was a passenger inside defendant's vehicle when defendant observed Dejon Miguel, a surviving victim in this case, enter a vehicle that was parked at Melba's with two other men. Defendant had been involved in an altercation with Miguel earlier that week due to a long standing rivalry between residents of their respective neighborhoods. Love testified that defendant removed his shirt and tied it around his face, exited his vehicle, and opened fire on the three occupants of the red vehicle. An occupant of the red vehicle returned fire, so Love opened the passenger door of defendant's car and fired his gun into the red vehicle as well. As Love and defendant fled the scene, Love disposed of the two guns by throwing them out of the car window. Love identified defendant in the courtroom as the perpetrator and instigator of the shooting.
Defendant argues that uncorroborated accomplice testimony should not be given the same weight as other eyewitness testimony when no physical evidence presented at trial confirmed his identity as the assailant, and therefore the State's proof did not establish his guilt beyond a reasonable doubt. Defendant presents no authoritative support for this assertion, although in his second assignment of error, discussed below, he cites State v. Schaffner , 398 So.2d 1032, 1035 (La. 1981), for the proposition that the court's failure to instruct the jury to treat uncorroborated accomplice testimony with caution constitutes reversible error.[2] In Schaffner , Justice Lemmon's concurrence observes that uncorroborated accomplice testimony is sufficient to sustain a conviction:
In some jurisdictions the uncorroborated testimony of an accomplice cannot sustain a conviction. See Pollard v. State , [264 Ark. 753] 574 S.W.[2d 656] 2656 (Ark. 1978) ; Jones v. State , 368 So.2d 1265 (Miss. 1979). Louisiana, wisely in my opinion, has not adopted this rule. State v. Matassa , 222 La. 363, 62 So.2d 609 (1953) ; State v. May , 338 [339] So.2d 764 (La. 1976). In Louisiana the weight to be accorded to the testimony of an accomplice is determined by the jury (or the judge in a bench trial), which is the sole arbiter of the credibility of witnesses. See C.Cr.P. art. 802(3).
* * *
Louisiana judges are statutorily prohibited from commenting to the juries on the credibility of witnesses. See C.Cr.P. arts. 772 and 806. This rule constitutes legislative recognition that it is exclusively the jury's function to assess credibility. See C.Cr.P. art. 802(3). Jurors can (and must) call upon the sum total of their experience with other human beings in performing this most difficult and critical task. Jurors do not need to be "warned" about the probability that an accomplice may have misrepresented the facts in an effort to save himself from a more severe penalty. R.S. 15:492 allows liberal cross-examination to expose *390 the bias or interest of witnesses, including accomplices who become prosecution witnesses.
Schaffner , 398 So.2d at 1036 (Lemmon, J., concurring).
The Third Circuit recently considered the issue of whether "the principle of caution regarding accomplice testimony applies to [a defendant's] sufficiency of the evidence argument." State v. Kato , 12-1356, p. 2 (La. App. 3 Cir. 5/15/13), 157 So.3d 695, 698. In this context, the Third Circuit treated the accomplice testimony as any other eyewitness testimony, stating:
[C]redibility assessments are within the province of the fact-finder, in this case the jury. A jury may "accept or reject, in whole or in part," any witness's testimony. State v. Silman , 95-0154, p. 12 (La. 11/27/95), 663 So.2d 27, 28. Clearly, the jury believed the [witness's] version of events, and [defendant's] brief offers no concrete reason why the jury's conclusion should be considered unreasonable. This court will overturn a jury's credibility assessment only when a witness's own testimony demonstrates that the witness's ability to perceive events was impaired in some way.
Id. at pp. 2-3, 157 So.3d at 698. Additionally, the Louisiana Supreme Court has stated (notwithstanding the separate issue of a trial court's refusal to give requested, precautionary jury instructions) that as a general proposition of Louisiana law, uncorroborated accomplice testimony is sufficient evidence to sustain a conviction. State v. Hollins , 08-1033, p. 4 (La. 6/26/09), 15 So.3d 69, 71 (citing State v. Tate , 01-1658, p. 4-5 (La. 5/20/03), 851 So.2d 921, 928, cert. denied , 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004) ).
Here, the jury apparently chose to believe Love's testimony that he saw defendant wrap a shirt around his face, exit his vehicle, and open fire on the victims' vehicle. Other than the mysterious letter that Love claimed he did not write, there does not appear to be any evidence in the record that materially contradicts his testimony. The video surveillance footage, the discovery of the discarded guns on Marais Street, and the ballistics evidence tying the casings recovered from Melba's to the two discarded guns all corroborate Love's testimony such that the jury could rationally rely on the evidence to reach its verdicts. Viewing the evidence in the light most favorable to the prosecution under Jackson v. Virginia , supra , a rational fact finder could have found that defendant committed the crimes charged beyond a reasonable doubt. This assignment of error is without merit.
ASSIGNMENT OF ERROR NUMBER 2
Defendant's second assignment of error argues that the trial court erred in failing to instruct the jury that uncorroborated accomplice testimony should be treated with caution, citing Schaffner :
Where the state's case relies upon the uncorroborated testimony of an accomplice, the trial judge should instruct the jury to treat such testimony with caution; however, such a cautionary instruction is not necessary in all cases in which an accomplice testifies on behalf of the state. Where there is material corroboration of the accomplice's testimony, the cautionary accomplice instruction is not required. State v. Murray , 375 So.2d 80 (La. 1979) ; State v. May , 339 So.2d 764 (La. 1976) ; United States v. Lee , 506 F.2d 111 (D.C. Cir. 1974), cert. denied , 421 U.S. 1002, 95 S.Ct. 2403, 44 L.Ed.2d 670 (1975). The matter is one within the sound discretion of the trial court. As noted in Lee , it is enough if there is evidence that confirms material points in an accomplice's tale, and confirms the *391 defendant's identity and some relationship to the situation.
398 So.2d at 1035. Notably, the assignment of error at issue in Schaffner , from which this quote is taken, is whether the trial court committed reversible error in refusing to give defendant's requested jury instruction to treat uncorroborated accomplice testimony with caution. Id. at 1033. The instant case is distinguishable because here, defendant did not ask the trial court to instruct the jury regarding accomplice testimony. Without such a request, defendant is precluded from raising this as an assignment of error under La. C.Cr.P. art. 801 (C), which provides:
A party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error. The nature of the objection and grounds therefor shall be stated at the time of objection. The court shall give the party an opportunity to make the objection out of the presence of the jury.
In this case, on the morning of the second day of trial and out of the presence of the jury, the court asked if either party planned to file any requests for special jury instructions. Defendant responded that he had already filed one request: that the court instruct the jury that a conviction of second degree murder carried a mandatory life sentence. Defendant indicated that he did not plan to file any additional requests. Following the evidentiary portion of the trial, the court reviewed the proposed jury instructions in chambers in the presence of defendant and counsel for both parties. The State requested an instruction that the jury may infer guilt from defendant's flight from justice. Defendant objected to the state's proposed instruction on the basis that Detective Magee had not positively identified defendant as the shooter when he witnessed the incident and pursued the fleeing vehicle, and that there was no evidence presented that defendant knew a warrant for his arrest had been issued in Louisiana when he was located and arrested in Texas.
The record indicates that the trial court agreed to give general jury instructions, the defendant's requested mandatory life sentence charge, the State's requested charge inferring guilt from defendant's flight from justice, and the elements of each crime charged, as well as the definitions and elements of all responsive verdicts. Following this discussion, the court asked whether there were any objections, and counsel for defendant objected only to the instruction relating to the flight from justice.
After closing arguments, the court read the jury instructions as indicated above and dismissed the jury to deliberations. Again counsel was given an opportunity to lodge any objections to the court's jury instructions. And again, counsel for defendant objected only to the "flight" instruction.
During deliberations, the jury posed several written questions to the court, including questions of fact and questions of law, and it asked for the jury instructions in writing. The court discussed acceptable responses with both parties on the record. Defendant objected to putting the jury instructions in writing; the court therefore re-read the instructions to the jury and sent them back into deliberations. The court then asked if there were any objections, and defendant lodged no objection related to accomplice testimony.
In short, defendant neither requested a special jury instruction regarding accomplice testimony nor objected to *392 the failure of the court to issue such an instruction. Defendant is therefore procedurally barred from assigning as error the failure to give a jury charge under La. C.Cr.P. art. 801 (C) ; State v. Howard , 98-0064 (La. 4/23/99), 751 So.2d 783, 801. Even if defendant's argument were valid, however, Love's testimony is corroborated by other evidence presented at trial. Thus, any refusal to give such an instruction would not have been erroneous under Schaffner , supra . We find defendant's second assignment of error is without merit.
ASSIGNMENTS OF ERROR NUMBERS 3 AND 4
Assignment of error number three argues that the laws authorizing a non-unanimous jury verdict is a violation of the Sixth and Fourteenth Amendments to the U.S. Constitution and addresses the allegedly racially discriminatory history and purpose of those laws.[3] Assignment of error number four argues that the non-unanimous jury verdict deprived defendant of his general right of due process. In essence, both assignments of error allege that the laws authorizing conviction for a non-capital crime (in which the punishment is confinement at hard labor) by only ten members of a twelve-person jury are unconstitutional.[4]
Here, eleven out of the twelve jurors voted to convict defendant for second degree murder of Toby Roche, while the two guilty verdicts for attempted second degree murders of Malik Miguel and Dejon Miguel were unanimous. Defendant concedes that the Louisiana laws allowing non-unanimous jury verdicts for noncapital crimes repeatedly have been upheld as constitutional. Nevertheless, defendant preserves these alleged errors for further review in the event the status of the law should change.
Both LA. CONST. art. 1 § 17 and La. C.Cr.P. 782 (A) provide:
A criminal case in which the punishment may be capital shall be tried before a jury of twelve persons, all of whom must concur to render a verdict. A case in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict. A case in which the punishment may be confinement at hard labor or confinement without hard labor for more than six months shall be tried before a jury of six persons, all of whom must concur to render a verdict.
Under La. R.S. 14:30.1, the punishment for second degree murder is a mandatory life sentence at hard labor with no benefit of parole, probation, or suspended sentence. Under 14:27, for an attempted offense in which the punishment for the underlying offense is necessarily a death or life sentence, the punishment is imprisonment at hard labor for ten to fifty years, with no benefit of parole, probation, or suspended sentence. Because the punishment for these noncapital offenses is hard labor, the verdict requires at least ten members of a twelve-person jury to find the accused guilty to render a guilty verdict.
The issue of non-unanimous jury verdicts has been considered and rejected by this Court in a number of cases. For example, in State v. Mack , 12-0625, pp. 4-5 (La. App. 4 Cir. 5/6/15), 162 So.3d 1284, 1287-88, our Court held:
*393 [O]ur present jurisprudence provides that non-unanimous verdicts in noncapital felony cases do not violate the Sixth and Fourteenth Amendments. Defendant makes no persuasive argument that non-unanimous verdicts in noncapital felony cases calling for mandatory life sentences without parole upon conviction call for a different result. Apodaca v. Oregon , 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972) ; McDonald v. City of Chicago , 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (recognizing Apodaca's continuing viability); State v. Bertrand , 2008-2215 (La. 3/17/09), 6 So.3d 738 ; State v. Curtis , 2011-1676 (La.App. 4 Cir. 3/13/13), 112 So.3d 323.
Id. (footnote omitted).
In State v. Bertrand , 08-2215pp. 4-7 (La. 3/17/09), 6 So.3d 738, 741-43, The Louisiana Supreme Court confirmed that under current U.S. Supreme Court jurisprudence, non-unanimous twelve-person jury verdicts do no violate a defendant's constitutional rights under the Sixth and Fourteenth Amendments, and La. C.Cr.P. art. 782"withstands constitutional scrutiny." See also State v. Lewis , 16-0224 p. 21 (La. App. 4 Cir. 12/29/16), 209 So.3d 202, 215 (finding Bertrand dispositive on this issue); State v. Barbour , 09-1258, p. 16 (La. App. 4 Cir. 3/24/10), 35 So.3d 1142, 1151, cert. denied , 562 U.S. 1217, 131 S.Ct. 1477, 179 L.Ed.2d 302 (2011) (finding Bertrand dispositive of defendant's argument that a non-unanimous jury verdict violated the Fifth, Sixth and Fourteenth Amendments); State v. Frith , 13-1133, pp. 18-19 (La. App. 4 Cir. 10/22/14), 151 So.3d 946, 957 (finding defendant failed to meet his burden of proving that either LA. CONST. art. I § 17 (A) or La.C.Cr.P. art. 782 (A) is unconstitutional insofar as these statutes provide for non-unanimous jury verdicts).
Under the current law, the trial court did not commit error in denying defendant's motion to declare as unconstitutional the statutes that permit a noncapital felony conviction by a unanimous twelve-person jury. Assignments of Error 3 and 4 do not warrant relief.
CONCLUSION
For the reasons expressed herein, defendant's convictions on one count of second degree murder and two counts of attempted second degree murder, and the corresponding sentences imposed, are affirmed.
AFFIRMED

NOPD Detective Winston Harbin, Jr., who was not familiar with the case or any of the suspects, testified that he administered the "six-pack lineup" to Love during his interrogation. Detective Harbin memorialized Love's selection by having him sign the back of the chosen photo. The signed NOPD Eyewitness Identification Form contained in the appellate record shows that Love selected the photo of defendant, Janero McBride.

The Schaffner court held that a trial court's refusal to give that jury charge may constitute error unless material portions of the accomplice testimony are corroborated by other evidence.

La. Const. art. 1 § 17 ; La. C.Cr.P. art. 782.

Before trial defendant filed a "Motion to Declare La. C.Cr.P. art. 782 (A) and La. Const. art. I, § 17, Unconstitutional Because They Allow for a Non-unanimous Verdict," which the trial court denied.