JAMES F. MCKAY, CHIEF JUDGE
The defendant, Kenneth Klein, appeals his conviction on one count of possession with intent to distribute pornography involving juveniles under the age of thirteen in violation of La. R.S. 14:81.1(E)(5)(a) and *976 nineteen counts of possession with intent to distribute pornography involving juveniles under the age of seventeen in violation of La. R.S. 14:81.1(C)(2). For the reasons that follow, we affirm the defendant's conviction and sentence.
STATEMENT OF THE CASE
On June 26, 2015, the State charged the defendant with one count of possession with intent to distribute pornography involving juveniles under the age of thirteen in violation of La. R.S. 14:81.1(E)(5)(a) ; and nineteen counts of possession with intent to distribute pornography involving juveniles under the age of seventeen in violation of La. R.S. 14:81.1(C)(2). The defendant pled not guilty.
The defendant filed motions to suppress statements and physical evidence. On June 23, 2016, the trial court denied the defendant's motions to suppress and found probable cause.
On August 26, 2016, the trial court granted the state's motion to introduce evidence of other crimes pursuant to La. C.E. art. 412.2. This evidence involved prior sexual abuse allegations made against the defendant by his biological son and stepdaughter when they were minors.
On April 6, 2017, the jury returned a guilty verdict on all counts. On May 12, 2017, the trial court denied the defendant's Motion for Post-Verdict Judgment of Acquittal and Motion for New Trial. The defendant was sentenced to five years on each of the nineteen counts in violation of La. R.S. 14:81.1(C)(2), to be served concurrently. On the one count in violation of La. R.S. 14:81.1(E)(5)(a), the defendant was sentenced to twenty years to be served concurrently with his other sentences. The trial court ordered that the defendant's personal property used in the commission of the offenses be seized and impounded by law and sold at public sale or public auction in accordance with La. R.S. 15:539.1. The trial court also imposed a fine of $2,500.00 and ordered that upon completion of the defendant's term of imprisonment, he be monitored by the Department of Safety and Corrections through the use of electronic monitoring equipment for the remainder of his natural life pursuant to La. R.S. 81.1(E)(5)(e).
STATEMENT OF THE FACTS
At the June 14, 2016 motions hearing, Louisiana State Trooper Christopher Treadaway, a detective with the Special Victims Unit, testified that in February 2014, he conducted an undercover investigation through the use of law enforcement software, which monitored peer-to-peer[1] internet sites to identify individuals who were sharing child pornography. Information gleaned from monitoring the internet led Trooper Treadaway to a single IP (Internet Protocol) address[2] in New Orleans that, for quite a few days, was swapping and trading child pornography. Trooper Treadaway issued a subpoena duces tecum to the internet service provider, in this case AT & T, for that IP address. He learned the subscriber on that account was identified as the defendant, residing at 2819 Carondelet Street.[3]
Trooper Treadaway conducted a surveillance of the Carondelet Street address to confirm that someone lived there. He then *977 obtained a search warrant for the premises. Trooper Treadaway assembled a team of six or seven fellow law enforcement personnel - including Sergeant Joe Patout, and Agent Lisa Maher - to execute the search warrant.
Trooper Treadaway testified that when he knocked on the front door of the Carondelet Street residence no one answered, so the officers went around and knocked on the back door. At that time, the defendant called to the officers from a window, then let them in.
Trooper Treadaway stated that in his initial surveillance of 2819 Carondelet Street, the structure looked like a single residence. From the inside, it was apparent that the building had been partitioned into multiple units. The defendant's apartment was on the second floor. Upon entering the apartment, the officers encountered Lauren Devoe, the defendant's fiancée. After performing a safety sweep of the premises, the officers confiscated a Toshiba computer, a Lenovo laptop computer, a thumb drive and a USB drive found in the defendant's bedroom.
Trooper Treadaway performed an on-scene forensics examination of the computers using a program named Encase. He pulled the hard drive from the Toshiba computer and connected it to a device named Write Blocker, which prevents alteration of the computer's hard drive but allows a forensic investigator to inspect the hard drive's file system and look at the contents of the files. His examination revealed that the defendant's IP address was actively sharing child pornography. Trooper Treadaway personally viewed nineteen videos on the defendant's computer that contained child pornography, and one photo that appeared to involve a child between the age of eight and thirteen. No evidence was found to suggest that the defendant's computer had been hacked or remotely accessed. The computer was taken back to the State Police field office for further testing. Trooper Treadaway took no statements from the defendant at the scene.
Under cross-examination, Trooper Treadaway said there was no way to determine the identity of the person who downloaded the contraband to the defendant's Toshiba computer. He also stated that the fact an IP address associated with a certain name is active, does not necessarily mean that the owner of that IP address is the user or only user.
Sgt. Patout, a case agent handling child exploitation cases for approximately six years, participated in the investigation. Recounting the search of the defendant's residence, Sgt. Patout testified at the motions hearing that he and Trooper Treadaway's team had difficulty entering the home. They knocked at the front door and when they received no answer, they went to the rear and knocked. The defendant looked out the window. The officers identified themselves and informed him they had a search warrant. The defendant let them in. When the officers entered the defendant's apartment, Sgt. Patout directed the defendant and his fiancée to sit on a couch. He then conducted a safety sweep of the premises. Thereafter, Sgt. Patout escorted the defendant into a back room, where he administered Miranda warnings. The defendant acknowledged he understood his rights, and Sgt. Patout explained the nature of the investigation to the defendant. The defendant waived his rights and chose to speak to Sgt. Patout. The interview was not recorded.
Sgt. Patout explained that the defendant said he was a published journalist, doing research on child pornography for the Huffington Post. His research entailed downloading child pornography from the internet via peer-to-peer file sharing software, using search terms Sgt. Patout was *978 familiar with through his child exploitation work. The defendant admitted downloading material the previous day. The defendant stated that he never published his work or told anyone about it. The defendant indicated he downloaded the information to his Toshiba computer, which could be found in his bedroom. The defendant did not say that the information on his computer was placed there by a hacker or via remote access. The defendant was arrested following the search.
Under cross-examination, Sgt. Patout testified the defendant admitted he was aware that the information on his computer could be seen and downloaded by others looking for child pornography on the internet. In addition, Sgt. Patout confirmed that the defendant did not request an attorney before speaking with him.
Following the motions hearing, the trial court denied the defendant's motion to suppress evidence and statements. Probable cause was found, and the case proceeded to trial.
The jury trial was conducted from April 4, 2016 to April 6, 2016. Trooper Treadaway and Sgt. Patout testified at trial, reiterating their testimony given at the motions hearing regarding the investigation and arrest of the defendant.
Agent Maher, with the forensics unit of the Attorney General's Office specializing in internet crimes against children, testified at trial that she investigated thousands of child pornography cases with the Louisiana Department of Justice. Trooper Treadaway sought her assistance in conducting a forensic review of the defendant's computers during the execution of the search warrant in this case. Agent Maher discovered that the computer located in the defendant's bedroom contained child pornography. She explained her examination procedure as removing the computer hard drive and connecting it to a write-blocker, which prevents alteration of and safeguards the data on the hard drive. She then used Encase, a forensic program, to view videos, images, text documents, etc. stored in the computer. Agent Maher located video files with titles indicative of child pornography and viewed those. Agent Maher stated that she located files on the defendant's computer titled PTHC, which is an acronym for "Pre-Teen Hard Core." She explained the videos were in a folder, within a folder and in numerous subfolders on the hard drive. Agent Maher transferred the contraband material to disks for trial purposes.[4] Finally, Agent Maher stated that she observed no evidence that the defendant's computer had been hacked.
M.D.,[5] the defendant's stepdaughter, testified on behalf of the state. M.D. stated she was one or two years old when the defendant began dating her mother, Tzipora Katz. She said the defendant molested her, touched her breasts frequently and removed her clothes as he photographed her. She stated the defendant touched her inappropriately until she was eleven years old.
M.D. further testified the defendant molested her younger brother, J.K., the defendant's biological son, by touching him inappropriately and photographing him in the nude. M.D. stated the defendant also beat her mother, punched her mother in *979 the stomach when she was pregnant and pushed her down the stairs. On one occasion, the defendant hit M.D.'s mother so hard, her contacts were knocked out of her eyes. The abuse in their household did not abate until Mrs. Katz divorced the defendant.
M.D. stated the defendant made her watch as he masturbated and forced her to perform fellatio on him when she was about three years old. The defendant would make her and her brother touch each other's genitals, and he would photograph them as they did so.
On cross-examination, M.D. admitted she did not tell her mother of the abuse because she feared she and her brother would be taken away. In fact, M.D. was interviewed by child protective services on one occasion but she lied and denied any molestation. She recalled being homeless at age seven and living in a van with her mother, her brother and the defendant during that time. Her mother and the defendant were members of the Wiccan religion and would travel the country singing at various festivals. They were revered as spiritual leaders within their coven - her mother was a high priestess and the defendant was a high priest. She and her brother were exposed to nudity at many festivals and were molested by others attending the festivals.
J.K., the defendant's biological son, testified he knew the defendant as "regrettably, the man [who] is my biological father." J.K. recalled that his life was spent on the road until the age of seven when his family lived in Pennsylvania and New Jersey. He described his relationship with the defendant as he was growing up as "horrific ... [e]very day was fear, every day was hunger and wanting, every day was painful in so many ways." His first memory of being abused by the defendant was when he was four years old. The defendant made him and his sister disrobe and get into a hot tub and touch each other all over their bodies - chest and genitals - and forced them to kiss and lick one other. When J.K. was six years old, the defendant played a game with him which the defendant called "breaching [sic] whales." The defendant and J.K. "would stand in front of each other naked, thrust [their] hips up towards each other so that [their] penises would touch." J.K. recalled instances where the defendant would hurt him if he did not do what the defendant instructed. J.K. indicated his life with the defendant caused panic attacks, severe anxiety and post-traumatic stress disorder.
Jim Huey testified that he worked for the Orleans Parish Sheriff's Department and was the custodian of records of inmate telephone calls. He stated that the telephone calls of the inmates are recorded on an internet-based system and stored on a secured database. Mr. Huey testified that when an inmate makes a call, the inmate must use a pin/folder number issued to the inmate at booking. One of Mr. Huey's duties is to provide law enforcement agencies copies of an inmate's jailhouse telephone calls, which are recorded, stored and reproduced in the regularly conducted business activity of the Sheriff's Office. Mr. Huey explained that as an inmate makes a call from the Orleans Parish Prison, the inmate is issued a warning that the call will be monitored and recorded. Mr. Huey also noted that a call detail sheet, which lists the specifics of an inmate call, i.e. , name of caller, time, duration, number called, etc., accompanied the recording of jailhouse calls.
Pursuant to the state's request, Mr. Huey supplied disks containing recordings of two calls the defendant placed while incarcerated at Orleans Parish Prison. Both of the calls were made by the defendant to his fiancée, Ms. Devoe. In one of *980 the calls Ms. Devoe tells the defendant she is securing counsel for him and asks what he is charged with. The defendant responds: "Underage pornography, which you warned me about." In the second call, Ms. Devoe informs the defendant he has been charged with twenty counts of "illegal pornography." The defendant explains to Ms. Devoe that each count pertains to a download on his computer. Ms. Devoe tells the defendant she has secured an attorney to represent him, and then they discuss the possibility of bail.
The defense called Mrs. Katz, the defendant's former wife, who said she met the defendant in 1983 in New York, when they were involved in music and the pagan religion. At the time she met the defendant, she was married and had a two-year-old daughter, M.D. She and the defendant had a son together, J.K. Mrs. Katz stated that she was the victim of domestic violence throughout her marriage to the defendant. After one episode of violence in 1990, police urged her to press charges against the defendant; however, she refused because at the time she had no education or place to live and was unsure how she would support her children if the defendant had gone to jail. Mrs. Katz stated she did not learn the defendant had sexually abused the children until 1992. They were immediately placed in therapy, and she left the defendant and the pagan community. She divorced the defendant in 1994.
The defense called Ms. Tina Bindman, who knew the defendant and Mrs. Katz from their study and participation in the pagan religion. Ms. Bindman and her husband shared a house in 1980 with the defendant and Mrs. Katz for approximately two years. She knew their children and would on occasion care for the children when they were young. Ms. Bindman never saw the defendant abuse Mrs. Katz or the children. Eventually, Ms. Bindman and her husband moved from the house they shared with the defendant, Mrs. Katz and the children. Over the years, Ms. Bindman had little to no contact with Mrs. Katz or the defendant because of philosophical and personal differences but still considered the defendant a friend.
Ms. Devoe testified she had known the defendant for seven years, and that they lived in New Orleans at the time of his arrest. Ms. Devoe met the defendant at a musical festival in Ohio in 2010 and their relationship developed through the pagan community. As their relationship progressed, she heard "rumors" about the defendant's "prior cases." She confronted the defendant about "the ugly stuff" being said and after his explanation, she was satisfied he did not abuse women and children.
In the fall of 2012, Ms. Devoe and the defendant moved to 2819 Carondelet Street, which was a large two-story house, divided into four apartments on each floor. Ms. Devoe recalled that at approximately 6:30 a.m. on the morning of March 25, 2014, the police arrived at their apartment house and began ringing all the buzzers. Finally, an officer came up the back stairway and knocked on the rear door. The defendant answered the back door and Ms. Devoe heard someone announce he was a policeman and tell the defendant to step aside. The police entered the apartment and asked if anyone else was in the residence. Ms. Devoe made her presence known. An officer entered her bedroom and relocated them to the living room. Then, an officer removed the defendant to the "sunroom," which was about ten feet from where Ms. Devoe was seated. Eventually, the officer closed the door but not before she told the defendant to ask for a lawyer, which she heard him do. About twenty minutes later, the officer and the handcuffed defendant emerged from the sunroom, and the defendant was taken *981 away. Ms. Devoe stated the police never showed her or the defendant a search warrant.
Ms. Devoe confirmed that in one jailhouse call she asked the defendant what he was charged with and he responded: "For possession of underage pornography, which you warned me about." She explained that on previous occasions, she warned him about downloading information because he would do so all the time, and she worried he was unaware of the dangers of downloading such material. She never knew the defendant to have or view child pornography on his computer. She stated that the defendant did not abuse her or anyone else.
On cross-examination, Ms. Devoe admitted that she did not know the defendant in the 1980s and 1990s and therefore had no firsthand knowledge of how he treated his former wife and children. She also confirmed that in none of the jailhouse conversations did the defendant claim someone hacked his computer and/or placed information on it unbeknownst to him. She admitted that during one of the calls he told her: "I was downloading a bunch of stuff and some of it apparently had teens."
ERRORS PATENT
A review for errors patent on the face of the record reveals sentencing errors. The trial court failed to state that the defendant's sentences were to be served at hard labor, and failed to deny benefits of parole, probation, or suspension of sentence. However, those restrictions automatically are contained in the sentences whether or not imposed by the sentencing court. La. R.S. 15:301.1(A) ; State v. Dominick , 2013-0121, p. 5 (La. App. 4 Cir. 11/20/13), 129 So.3d 782, 787. Accordingly, those errors patent are self-correcting.
LAW AND ANALYSIS
On appeal, the defendant assets four assignments of error: 1) The trial court erred in denying his motion to suppress evidence; 2) The trial court erred in denying his motion to suppress statements; 3) The trial court erred in granting the state's motion to admit evidence of other crimes; and 4) The defendant was denied his right to present a defense.
Assignment of Error No. 1
In the first assignment of error, the defendant maintains that the trial court erred in the denial of his motion to suppress the evidence. He argues that because the search warrant failed to specify the number of the defendant's apartment in the two-story/multi-unit structure to be searched, the derivative evidence should have been excluded.
"Trial courts are vested with great discretion when ruling on a motion to suppress. Consequently, the ruling of a trial judge on a motion to suppress will not be disturbed absent an abuse of that discretion." State v. Long , 2003-2592, p. 5 (La. 9/9/04), 884 So.2d 1176, 1179 (citing State v. Horton , 2001-2529 (La. 6/21/02), 820 So.2d 556, 561 ).
As the Louisiana Supreme Court stated in State v. Korman , 379 So.2d 1061, 1063 (La. 1980),
A search warrant must particularly describe the place to be searched. U.S. Const. Amend. 4 ; La. Const. art. 1, s. 5 (1974) ; La. Code Crim.P. art. 162. The description contained in the search warrant is adequate if it is sufficiently detailed so as to allow the officers to locate the property with reasonable certainty and with reasonable probability that they will not search the wrong premises. Steele v. United States, 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757 (1925) ;
*982 State v. Segers, 355 So.2d 238 (La.1978) ; State v. Cobbs , 350 So.2d 168 (La.1977).
This court has held that a minor error in a portion of the description of the premises to be searched does not invalidate the search. State v. Segers, supra ; State v. Petta , 354 So.2d 563 (La.1978) ; State v. Cobbs, supra; State v. Alexander , 337 So.2d 1111 (La.1976) ; State v. Chaffin , 324 So.2d 369 (La.1975), Cert. denied , 426 U.S. 907, 96 S.Ct. 2228, 48 L.Ed.2d 832.
In State v. Alonzo , 95-2483, pp. 2-3 (La. 5/31/96), 675 So.2d 266, 267, the Louisiana Supreme Court further stated,
As a general rule, mistakes in the use of municipal numbers do not invalidate a search warrant which otherwise describes the premises with sufficient particularity such that the officer with the warrant "can with reasonable effort ascertain and identify the place intended." Steele v. United States , 267 U.S. 498, 503, 45 S.Ct. 414, 416, 69 L.Ed. 757 (1925) ; [Maryland v. ] Garrison , 480 U.S. [79] at 88-89, 107 S.Ct. [1013] at 1019 [94 L.Ed.2d 72 (1987) ] (citing Steele ); State v. Scramuzza , 408 So.2d 1316, 1317-18 (La. 1982) ; State v. Korman , 379 So.2d 1061, 1063 (La.1980) ; see also 2 Wayne R. LaFave, Search and Seizure, § 4.5(a) at 522 (3d ed. 1996) ("[T]he cases reflect an understanding of the fact that errors can easily occur in the use of numbers, such as an apartment or house number, and that it should be presumed that such an error did occur when other descriptive facts fit a different location.")
Trooper Treadaway obtained the defendant's address from AT & T's response to his subpoena seeking the name of the account holder for the IP address he had identified as a source accessing child pornography. The return on the subpoena identified the defendant as the account holder and listed his address as 2819 Carondelet Street. Treadaway then conducted a surveillance of the address to verify it was inhabited. He executed an affidavit for the search warrant and described the premises to be searched as:
2819 Carondelet Street, New Orleans, La., described as the middle first floor apartment of a raised two story wood frame structure with grey stucco and white trim. The apartment has a shared stairway on the south side that leads to the first floor. The numbers 2819 in white are affixed to a window above the front door facing Carondelet Street.
Trooper Treadaway testified that on the day the search warrant was executed, he and Sgt. Patout knocked on the door of the Carondelet Street house bearing the number "2819" and received no response. Trooper Treadaway relocated to the back door and knocked. The defendant called to Trooper Treadaway from a window, then showed the officers into his apartment.
The defendant contends the failure to specify his apartment number on the warrant rendered the warrant insufficient to enable the officers to locate with certainty the area to be searched and eliminate the possibility the police would search the wrong premises. The defendant's argument is unpersuasive.
The evidence shows Trooper Treadaway correctly described the building on Carondelet Street as is evidenced by the copy of the picture of the building affixed to the affidavit for search warrant. Had the officers gained entrance without assistance, they would have ascended the stairs to the floor identified as 2819 Carondelet Street and would certainly have been able to determine which apartment the defendant lived in by simply knocking. By happenstance, the defendant was at home. Moreover, because Trooper Treadaway conducted a surveillance of the targeted premises *983 and was present during the search, the intended location was in fact the one searched.
After considering the record evidence and the applicable jurisprudence, we conclude that the trial judge correctly determined that there was no deficiency in the warrant. Accordingly, we find no error in the denial of the defendant's motion to suppress the evidence.
Assignment of Error No. 2
Here, the defendant complains of error in the denial of his motion to suppress the statements made to Sgt. Patout while in his apartment. The defendant concedes his Miranda rights were read to him, but he claims that his request for an attorney was ignored.
"A defendant adversely affected may move to suppress any evidence from use at the trial on the merits on the ground that it was unconstitutionally obtained." La. C.Cr.P. art. 703(A). In reviewing a trial court's suppression ruling, an appellate court is not limited to evidence adduced at the hearing on the motion to suppress; it may also consider any pertinent evidence given at trial of the case. State v. Nogess , 98-0670, p. 11 (La. App. 4 Cir. 3/3/99), 729 So.2d 132, 137.
"A trial court's ruling on a motion to suppress the evidence is entitled to great weight because the court has the opportunity to observe the witnesses and weigh the credibility of their testimony." State v. Robinson , 2009-1269, p. 5 (La. App. 4 Cir. 5/12/10), 38 So.3d 1138, 1141 (citing State v. Mims , 98-2572, p. 3 (La. App. 4 Cir. 9/22/99), 752 So.2d 192, 193-194 ). Moreover, this Court has recognized that "[o]rdinarily, a trial court's determination of whether Miranda rights were 'knowingly and intelligently' waived should not be overturned on appeal absent a finding that the trial court abused its discretion." State v. Harris , 2011-0941, p. 18 (La. App. 4 Cir. 8/2/12), 98 So.3d 903, 916.
In Harris, this Court recognized the well-settled standard for whether a defendant's statement may be admitted at trial:
"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Miranda v. Arizona , 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), (citing Escobedo v. State of Illinois , 378 U.S. 478, 490, n. 14, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). "Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders." Id. (emphasis added). See also La. C.Cr.P. Art. 703D ("the state shall have the burden of proving the admissibility of a purported confession or statement by the defendant"); State v. Thompson , 399 So.2d 1161, 1167-1168 (La. 1981).
Thus, a defendant's "statement during a custodial interrogation i[s] inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived Miranda rights' when making the statement." Berghuis v. Thompkins , 560 U.S. 370, 130 S.Ct. 2250, 2260, 176 L.Ed.2d 1098 (2010), quoting North Carolina v. Butler , 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).
"Voluntary" waiver is distinguishable from "knowing" waiver. "[W]aiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.' "
*984 Berghuis, 560 U.S. at [382], 130 S.Ct. at 2260, quoting Moran v. Burbine , 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).... "[A] knowing" waiver [ ] requires inquiry into whether the statement was " 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " Id.
Harris , 2011-0941, pp. 13-14, 93 So.3d at 913.
"The admissibility of a confession or statement is a determination for the trial judge and the judge's conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession or statement are entitled to great weight and will not be overturned unless unsupported by the evidence." State v. Arias-Chavarria , 2010-0116, p. 12 (La. App. 5 Cir. 9/28/10), 49 So.3d 426, 433 (citing State v. Franklin , 2003-0287, p. 4 (La. App. 5 Cir. 9/16/03), 858 So.2d 68, 70.
In the present case, Sgt. Patout testified he spoke to the defendant when he and the officers arrived to execute the search warrant. He explained to the defendant that they were conducting a child pornography investigation and had tracked the defendant's computer as having downloaded contraband material. Sgt. Patout asked if the defendant if he wanted to talk, and the defendant agreed. They stepped into an empty room, away from Ms. Devoe and the other officers. Sgt. Patout advised the defendant of his Miranda rights. The defendant acknowledged he understood his rights and said he wanted to talk. Sgt. Patout denied that the defendant requested an attorney.[6] Sgt. Patout was the only person present, other than the defendant, while his statements were made.
Conversely, Ms. Devoe testified when the officers entered the defendant's apartment, they seated her and the defendant on the couch and asked for identification. Sgt. Patout and the defendant moved to an adjacent room by themselves. However, before they left her presence, Ms. Devoe told the defendant to ask for an attorney, which she said she heard him do. Ms. Devoe also said she heard Sgt. Patout advise the defendant of his rights before closing the door.
The defendant does not contend he was coerced into giving the statement. Moreover, the evidence adduced at trial showed he was an educated man, a teacher and musician, suggesting he had no difficulty understanding his rights as given by Sgt. Patout.
The trial court considered the conflicting testimony of Sgt. Patout and Ms. Devoe. The court weighted Sgt. Patout's testimony that the defendant did not ask for an attorney after being read his Miranda rights, but rather that he understood his rights and wished to waive them. Based on the totality of the circumstances presented in this case, we find that defendant's statements were freely and voluntarily made after a knowing and intelligent waiver of his constitutional rights. Accordingly, the trial court did not abuse its discretion in denying the defendant's motion to suppress statements. This assignment of error is without merit
Assignment of Error No. 3
Here, the defendant argues the trial court erroneously permitted the state to introduce other crimes evidence at trial. More specifically, the defendant asserts *985 that the state should not have been allowed to present the testimony of the defendant's two adult children who testified that he sexually abused them and forced them to perform sexual acts on each other as young children while he watched.
"Generally, evidence of other crimes committed by the defendant is inadmissible due to the substantial risk of grave prejudice to the defendant." State v. McDermitt, 406 So.2d 195, 200 (La. 1981) (citing State v. Prieur , 277 So.2d 126 (La. 1973) ). Pursuant to La. C.E. art. 404(B)(1), "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Article 404 )(B)(1), however, provides for exceptions to this rule, which include admission for the purposes of proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident or when the evidence relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. Another exception stated in La. C.E. art. 404(B)(1) is supplied by La. C.E. art. 412.2(A), which provides:
When an accused is charged with a crime involving sexually assaultive behavior, or with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense, evidence of the accused's commission of another crime, wrong, or act involving sexually assaultive behavior or acts which indicate a lustful disposition toward children may be admissible and may be considered for its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403.
It is not necessary, for purposes of article 412.2 testimony for the defendant to have been charged, prosecuted, or convicted of the "other acts" described. See State v. Layton, 2014-1910 (La. 3/17/15), 168 So.3d 358. In order for any evidence deemed to fall within La. C.E. art. 412.2 to be admissible, it must pass the balancing test of La. C.E. art. 403, which provides: "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the dangers of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." "Unfair prejudice," as used in La. C.E. art. 403, means that "the offered evidence has 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.' " Author's Note (3), La. C.E. art. 403, Handbook on Louisiana Evidence Law, Pugh, Force, Rault & Triche, p. 380 (2011). "A trial court is vested with much discretion in determining whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect." State v. Gordon , 2013-0495, p. 23 (La. App. 4 Cir. 7/16/14), 146 So.3d 758, 772 (citing State v. Girard, 2012-0790, p. 6 (La. App. 4 Cir. 3/6/13), 110 So.3d 687, 691 ).
"A trial court's ruling on the admissibility of evidence will not be overturned absent an abuse of discretion." State v. Wright , 2011-0141, pp. 10-11 (La. 12/6/11), 79 So.3d 309, 316 (citing State v. Cosey , 97-2020 (La. 11/28/00), 779 So.2d 675, 684 ). "This same standard is applied to rulings on the admission of other crimes evidence under La. C.E. art. 404(B)(1) and evidence under La. C.E. art. 412.2." Wright, 2011-0141, p. 11, 79 So.3d at 316 (citing State v. Merritt , 04-0204 (La. App. 5 Cir. 6/29/04), 877 So.2d 1079, 1085 ).
In the present case, the state filed a Motion to Introduce Evidence of Other Crimes. At the hearing, defense counsel lodged an objection but did not present argument contesting the motion other than *986 requesting time for additional investigation because: "we are aware of these accusations in the past and I believe our primary concern at this point is going to be based on some of the information provided in this motion."
M.D. and J.K testified that they were repeatedly sexually assaulted by the defendant when they were between three and twelve years of age. M.D. recounted that the defendant regularly coached/ demanded that the children grope/fondle/lick each other's genitals, as he watched and photographed the inappropriate activity.
The defendant contends that the evidence regarding the abuse of his son and stepdaughter was more prejudicial than probative. He argues the act of downloading pornographic videos of children is a more passive and less violent crime than molestation or sexual assault, such that the alleged prior bad acts were so much more heinous that it would have to prejudice the jury against him.
In this case, the probative value of the evidence of the past sexually assaultive behavior is not substantially outweighed by its prejudicial effect. The defendant was charged with twenty counts of possession of child pornography/possession with intent to distribute child pornography. The police seized numerous videos depicting child pornography from the defendant's laptop computer. The behavior depicted on the video is strikingly similar to the acts described by M.D. and J.K. The defendant told the police his possession of the videos was related solely to his research for an article for the Huffington Post. However, there was no evidence presented at trial that the defendant possessed the images for professional research. See State v. Wright , 2011-0141, pp. 13-14, 79 So.3d at 317 (weighing the probative value versus the prejudicial effect of the other crimes evidence before it, the Wright court looked at the similarities between the other crimes evidence and the facts presently before it. Finding the similarities between the two acts "were sufficiently probative to support the admission" of the other crimes evidence, the Supreme Court noted that the "evidence demonstrates defendant had a propensity for sexual activity with adolescents where he held a position of authority, and where the adolescent children were in his household.").
Even if there was error in the admission of the evidence, "[t]he introduction of inadmissible other crimes evidence results in a trial error subject to harmless error analysis on appeal." State v. Frith , 2013-1133, pp. 13-14 (La. App. 4 Cir. 10/22/14), 151 So.3d 946, 954. The inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." Id. (quoting Sullivan v. Louisiana , 508 U.S. 275, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993) ).
Considering the overwhelming evidence of the defendant's guilt, it cannot be said the trial court abused its discretion by determining that the other crimes evidence was more probative than prejudicial. This assignment of error has no merit.
Assignment of Error No. 4
In his final assignment of error, the defendant complains he was denied his right to present a defense by curtailing the direct questioning of his ex-wife, Mrs. Katz. He claims the questions he posed to her were vital to his defense that he did not sexually abuse his children.
The Sixth and Fourteenth Amendments to the United States Constitution and Article 1, § 16 of the Louisiana Constitution guarantee a criminal defendant the meaningful opportunity to present a complete defense, including the right to compel the attendance of witnesses in his favor.
*987 Washington v. Texas , 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967) ("The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense. ... Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense."); Chambers v. Mississippi , 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense.").
A defendant in a criminal case should be allowed to present "reliable" evidence on any relevant matter. State v. Casey , 99-0023, p. 18 (La. 1/26/00), 775 So.2d 1022, 1037. "[The] right to present a defense, however, does not require the trial court to permit the introduction of evidence that is irrelevant or has so little probative value that it is substantially outweighed by other legitimate considerations in the administration of justice." State v. Fernandez , 2009-1727, p. 14 (La. App. 4 Cir. 10/6/10), 50 So.3d 219, 229 (citing State v. Mosby , 595 So.2d 1135 (La. 1992) ; La. C.E. art. 403 ).
In this case, the defendant was not on trial for the alleged sexual abuse of his children. Consequently, even if Mrs. Katz had testified that her children were not abused by the defendant, that testimony would not have impacted the verdict that the defendant was guilty of possession and distribution of child pornography.
Mrs. Katz was asked if she was aware that the defendant had abused the children. She replied that the children did not reveal the abuse to her until after she and the defendant had separated. This fact was corroborated by M.D.'s testimony.
The defense questioned Mrs. Katz about her role in the Wiccan religion after she and the defendant separated. The state objected on the grounds of relevance, which the judge sustained. Defense counsel then requested to proffer why the question was relevant to the defense; however, the judge refused: "Counsel, you are not going back over something you already talked about." The defendant has not explained how not allowing him to question Mrs. Katz's standing in the Wiccan community after their separation was relevant to proving that he did not molest his children. The defense questioned both M.D. and J.K. at length about the sexual abuse allegations and was unable to undermine their testimony. The record also contains nude photos the defendant took of J.K. as a young boy. Those photos were turned over to the state by M.D.
The defendant has not shown how his right to present a defense was adversely impacted by the trial court's evidentiary ruling regarding Mrs. Katz's testimony. This assignment of error is meritless.
CONCLUSION
Based on the foregoing, we find no merit in any of the defendant's assignments of error. Accordingly, we affirm the defendant's conviction and sentence.
CONVICTION AND SENTENCE AFFIRMED

Trooper Treadaway explained that a peer-to-peer network is an online network that people utilize to swap and trade electronic files.

Trooper Treadaway explained that every IP address is unique to the user.

The State and defense stipulated that if a representative from AT & T were called to authenticate the information forwarded to Trooper Treadaway, the records would be qualified as certified business records, admissible at trial.

Portions of the twenty disks which contained the files downloaded from the defendant's computer by Agent Maher were played for the jury. The disks displayed images of nude, male and female pre-teenagers engaged in sexual activity.

Although the defendant's stepdaughter and son are no longer minors, we will use their initials throughout this opinion to protect their privacy.

Trooper Treadaway testified at trial that the defendant later requested an attorney when he was brought to the State Police field office.